507 F.2d 525
 Dorothy Mae GARDNER, Plaintiff-Appellee,
v.
GENERAL MOTORS CORPORATION, Defendant-Appellant.
Mazie M. JOHNSON, Plaintiff-Appellee,
v.
GENERAL MOTORS CORPORATION, Defendant-Appellant.
Alice J. VAN LEWEN, Individually, et al., Plaintiffs-Appellees,
v.
GENERAL MOTORS CORORATION, Defendant-Appellant.
 No. 73-1966.
 United States Court of Appeals, Tenth Circuit.
 Argued July 12, 1974.
Decided Dec. 16, 1974.
 
 William H. Hazlitt, Denver, Colo. (Michael E. Oldham and Thomas H. Barrows, Weller, Friedrich, Hickisch & Hazlitt, Denver, Colo., and Ross L. Malone, of counsel, Gen. Motors Corp., Detroit, Mich., on the brief), for defendant-appellant.
 Thomas J. Constantine, Hindry & Meyer, Denver, Colo., for plaintiffs-appellees Van Lewen.
 Richard W. Laugesen, Dosh, DeMoulin, Anderson & Campbell, Denver, Colo., for plaintiff-appellee Johnson.
 Bennett S. Aisenberg, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for plaintiff-appellee Gardner.
 Before LEWIS, Chief Judge, and BREITENSTEIN and BARRETT, Circuit judges.
 LEWIS, Chief Judge.
 
 
 1
 This is a product liability case involving a 1966 three-quarter ton pickup truck manufactured and sold new by General Motors Corporation (GMC). The appeal is taken by GMC from judgments aggregating approximately $700,000 in actions brought and consolidated in the District Court for the District of Colorado under the Colorado Wrongful Death Act for the deaths of the husbands of the named plaintiffs. Each of the decedents had died from inhalation of massive quantities of carbon monoxide claimed by plaintiffs to be legally attributable to GMC through negligent design and marketing of the subject truck. Certain of the facts are not in dispute.
 
 
 2
 The truck was specifically advertised by GMC as one suitable for the installation and carrying of a camper unit. The purchaser, decedent Van Lewen had installed such a unit, purchasing it new from Colorado Camp-R-Land. That company installed the camper in standard fashion by drilling holes through the truck bed and securing the unit to the bed with bolts, washers and blocks. The camper was basically a wood frame covered with plywood on the inside and aluminum sheeting on the exposed outside walls. The unit contained a dinette area, an upper bunk, two sinks, a propane gas stove and oven, a propane gas light, and some cupboards. GMC makes no claim of liability avoidance through the fact of the camper addition or its installation.
 
 
 3
 On October 31, 1969, decedents went on a weekend hunting trip in Grand County, Colorado, anticipating a return to their homes on Sunday evening, November 2. They did not return. On November 5, the pickup camper was found by searchers parked alongside Beaver Creek Road at an elevation of 8800 feet. The ignition was 'on', the gears were in neutral, the gas gauge read empty, and the car battery was dead. Inside the camper the stove was off, the propane light was on but fuel exhaustion was so complete as to allow only an occasional flickering, and the windows were closed. The men were inside the camper, two seated at the table with unfinished cups of coffee and the third partially on the cot. Each was dead.
 
 
 4
 Plaintiffs' basic claim to liability has no complexities as such. The subject truck was equipped at the time of sale and at the time of decedents' deaths with a tail pipe that discharged engine en haust at a point beneath the approximate center of the truck bed and thus directly under the camper. They claim a defective design as the proximate cause of the deaths. GMC argues that plaintiffs failed to prove either a defective design or causation by competent proof or at all. We have no difficulty in rejecting the latter aspect of GMC's claim of error.
 
 
 5
 Following a month-long trial, the jury was instructed on three theories of recovery advanced by the plaintiffs: (1) GMC's negligence in regard to the design of the truck's exhaust port location; (2) GMC's breach of warranty in regard to the suitability of the truck for camper installation and use; (3) GMC's breach of its duty in strict liability. We conclude that each theory is legally acceptable under the evidence.
 
 Defective Design and Causation
 
 6
 In our consideration the verdict of the jury is entitled to that view of the evidence most favorable to plaintiffs, drawing all reasonable inferences and resolving all factual conflicts in accord with support for the verdicts.[1] Westing-house Credit Corp. v. Green, 10 Cir., 384 F.2d 298, 301; Union Carbide & Carbon Corp. v. Nisley, 10 Cir., 300 F.2d 561, 590, appeal dismissed sub nom., Wade v. Union Carbide & Carbon Corp., 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46. In addition to the undisputed facts recited other evidence gives basic support to plaintiffs' case. Eleven inches of snow surrounded the camper with a much lesser amount underneath the vehicle. Carbon monoxide is odorless, invisible, extremely lethal, and of light density, thus causing it to rise. The floor of the camper was sufficiently porous to allow seepage and the heat of the camper combined with the partial trappage of the gas below tended to create a drawing action. The propane light was not capable of creating sufficient carbon monoxide to cause the tragedy. Motor exhaust carries a high incidence of the deadly fumes. An exhaust pipe carrying the gases to a point beyond the perimeter of the camper would have prevented the accident.
 
 
 7
 Much of plaintiffs' case was of necessity based on the conclusions and opinions of expert witnesses. So, too, were GMC's defenses. In fact, GMC's argument that plaintiffs made no case at all is based on counter evidence that this was the only incident of its kind although thousands of trucks with similar short tail exhausts had been marketed by it and other manufacturers; that the results of its comprehensive post-accident tests showed conclusively that under no version of the meteorologic conditions and other existent circumstances could sufficient exhaust carbon monoxide enter the camper to cause death. GMC's evidence was certainly relevant to negative defective design and causation but, at this point, is simply a renewal of a jury argument. GMC is liable for the first accident as well as any other if caused by faulty design. So, too, the test results of GMC could be rejected by the jury by simply refusing an artificial facsimile in favor of an admitted fact. Massive amounts of carbon monoxide did enter the camper and did kill the decedents. We conclude that plaintiffs' evidence was clearly sufficient to support defective design and causation as a jury issue and equally sufficient to premise liability under breach of warranty and the doctrine of strict liability.
 
 Trial Errors, Evidence and Instructions
 
 8
 Prominent among GMC's claim of trial error is the repeated contention that plaintiffs' technical witnesses were not properly qualified to express opinions pertinent to the question of defect in the design of the truck's exhaust system. Thus, GMC argues that neither Professor Crawford nor Professor Carley was an expert in the field of exhaust system design, notwithstanding Professor Crawford was a mechanical engineer and past chairman of the Department of Engineering Design at the University of Colorado, and notwithstanding Professor Carley was a chemical engineer and a teacher of both chemical engineering and engineering design at the University of Colorado. In its ruling, the trial court noted specifically that
 
 
 9
 where an expert has the education or background to permit him to analyze a given set of circumstances He can through reading, calculations, and reasoning process from known scientific principles make himself very much expert in the particular product even though he has not had actual practical experience in its manufacture.
 
 
 10
 Significantly, we believe this rationale for the trial court's ruling is consistent with Rule 702 of the proposed Rules of Evidence for the United States Courts and Magistrates. That rule and the committee's note thereto indicate clearly that one may qualify as an expert by 'knowledge, skill, experience, training, or education' and that the 'expert' as such should not be required to satisfy an overly narrow test of his own qualifications. Indeed, the trial court went even further in the appellees' behalf, holding that their experts satisfied even a traditional, more restrictive test of expert's qualifications. See Phelps Dodge Corp. v. Atchison, T. & S.F. Ry., 10 Cir., 400 F.2d 20, 22-23; Jones v. United States, 10 Cir., 387 F.2d 1004, 1008, cert. denied, 392 U.S. 927, 88 S.Ct. 2224, 20 L.Ed.2d 1385, wherein we referred to 'the wide discretion accorded the trial court in determining the qualifications of a witness to testify as an expert . . ..' We perceive no reversible error in the rulings made by the trial court in respect of the introduction of the testimony given by appellees' experts. And this conclusion would remain valid although GMC's experts may hold more experience and training in the specifics of the limited field of expertise considered. Other contentions of GMC concerning the admission of testimony need not be specifically discussed as they bear a negligible impact upon the totality of the evidence.
 
 
 11
 GMC's attack upon the trial court's instructions has many facets, most of which admit the instructions to be properly applicable as to subject matter but which nonetheless criticize them as incomplete and lacking in clarity. In a complex case such as this we have yet to discover an instance where hindsight might not suggest some improvement in the most difficult field of jury instructions. Our review here, however, convinces us that the court's instructions were, with but one exception, clearly correct and fair and that they allowed the jury to perform its function with complete understanding of its decisional duties. The exception we note pertains to the instruction covering GMC's duty to warn of the danger of its exhaust system.
 
 
 12
 GMC contends that the trial court erred when it instructed the jury on GMC's duty to warn because there was no evidence that GMC knew of any danger or that GMC could have been expected to foresee any danger. That instruction would have allowed the jury to find that GMC was obliged to warn-- and, in turn, that GMC had breached that duty-- if 'in the exercise of reasonable care (GMC) should have known that the use of the product might be harmful or injurious and such danger would not be obvious to the ultimate user.' We believe that the instruction correctly stated the law. See Howard v. Avon Products, 155 Colo. 444, 395 P.2d 1007, 1011-1012 (en banc); Restatement (Second) of Torts 402A, comment j at 353 (1965). A correct statement of the law must, however, also find support in the evidence in the given case. We consider the plaintiffs' evidence on this aspect of the case to be scant but reaching minimal adequacy. By encouraging the modification of the pickup to that of a camper GMC knew or should have known that the vehicle would or might be used under an unlimited variance of weather conditions, terrain conditions, time conditions and other considerations and combinations thereof. So, too, there is some evidence that a chief design engineer for GMC called attention to an exhaust problem. Although we might well hesitate to affirm the judgments if duty to warn were the single theory of liability we consider plaintiffs' othe theories of recovery, none of which depend on jury conclusions regarding duty to warn, to overwhelm any potential error in this regard.
 
 Reduction of Van Lewen's Judgment
 
 13
 Finally, GMC contends that the trial court erred in denying GMC's motion to reduce the judgment in favor of the plaintiff Van Lewen in order to reflect a settlement previously made by her with Nu-Wa Campers, Inc., the manufacturer of the camper unit itself. In consideration of that settlement, Van Lewen's claim for relief against Nu-Wa Campers, Inc. was dismissed without prejudice. The trial court based its ruling on Cox v. Pearl Investment Co.,168 Colo. 67, 450 P.2d 60 (en banc). In Cox, the Colorado Supreme Court held that, where a tort victim covenanted not to sue one joint tortfeasor, and where the document signed by the victim evidenced the intention of the parties to the covenant that the other joint tortfeasor not be released, the covenant would not constitute a bar to the maintenance of a subsequent action by the victim against that other joint tortfeasor. In so holding, the court mentioned also the necessity that the consideration for the covenant be sufficient and, most signifficantly, that 'the non-settling joint tort-feasor . . . would be entitled to have the amount fo (any subsequent) judgment reduced by the amount paid by his co-tort-feasor.' 450 P.2d at 63; see W. Prosser, Law of Torts 50, at 304-05 (4th ed. 1971).
 
 
 14
 The rationale of Cox, that the tort victim be prevented from recovering twice for the same wrong, is properly applicable here, and accordingly we hold that GMC is entitled to a reduction in the Van Lewen judgment in the amount of $13,500. The trial court is directed to so reduce the judgment and the case is in all respects affirmed.
 
 
 
 [1]
 We leave for later consideration all claims of trial error relating to admissibility of evidence and correctness of instructions