William Jerry SMITH, Plaintiff-Appellant,

v.

MINSTER MACHINE COMPANY, Defendant-Appellee.

No. 80–1383.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 16, 1981.

Decided Jan. 21, 1982.

Rehearing Denied Feb. 18, 1982.

David Pearce, Abel, Musser, Sokolosky & Clark, Oklahoma City, Okl. (Ed Abel, Abel, Musser, Sokolosky & Clark, Oklahoma City, Okl., with him on brief), and Glen Mullins, Oklahoma City, Okl., for plaintiff-appellant.

Scott M. Rhodes, Huckaby, Fleming & Frailey, Oklahoma City, Okl. (Kent Fleming, Huckaby, Fleming & Frailey, Oklahoma City, Okl., with him on brief), for defendant-appellee.

Before DOYLE, BREITENSTEIN and McKAY, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is a diversity action which was brought in federal court pursuant to 28 U.S.C. § 1332. The judgment is one which was entered on a jury verdict and was in favor of the defendant, Minster Machine Company. The plaintiff, William Jerry Smith, a workman, was injured while operating a punch press manufactured by the defendant Minster. He incurred serious injury, including the loss of three fingers.

On June 2, 1977 plaintiff Smith was operating the machine, a 30-ton punch press, and was doing so while in the employ of Industrial Gasket Company in Oklahoma City, Oklahoma. Operation of the machine required Smith to place material in the press and then push buttons with both hands. The upper plate of the press would then descend to meet the lower plate, stamping out a product, such as a gasket. The upper plate would then rise and stop, allowing the operator to remove the product, which had been stamped, with his left hand and simultaneously insert another piece of raw material with his right hand. To reactivate the press it was necessary for the operator to press the buttons, one with each hand, thus insuring that his hands were out of the press before the plates met. Smith was an experienced operator and thus was able to perform these functions rapidly.

On the day in question, Smith had been operating Industrial Gasket's press number 4703 for about fifteen minutes when the press failed to stop after a stroke, and began running continuously. As a result Smith's right hand was caught in the press and he incurred the severe damage to the hand.

The suit is based on the contention of Smith that Minster manufactured a defective press and that this entitled him to recover damages from Minster for his injury under the doctrine of manufacturers' products liability. See *Kirkland v. General Motors Corp.*, 521 P.2d 1353 (Okla.1974).

The history of Press number 4703 has relevancy. It was manufactured in the 1950s. Minster sold the machine to Western Electric in 1955, which then sold it to Industrial Gasket Company in 1973. It was changed and added to before the present incident took place.

Also, the nature of the machine should be described. A selector switch on the side of the machine could be placed on "continuous". As so set, the machine would continue to run so long as the operator kept both hand buttons depressed (as indicated above). As soon as one or both were released, the machine would complete its stroke cycle and stop. If the selector switch was set on "single stroke," the machine would make one stroke and stop, regardless of whether or not the operator released the hand buttons. There was a dispute in the testimony as to whether the press was set on single stroke or continuous at the time of the accident.

The plaintiff's position on the setting of the press was that it was on single stroke when the accident occurred. His further contention was that an electrical relay had become stuck and that this caused the machine to begin stroking continuously. He maintained that the machine was defective in design because it failed to incorporate a double relay system whereby a failure in one relay could not result in continuous operation.

On the other hand, defendant maintained that the press was set on continuous. Defendant argued that it was possible for the machine to stroke repeatedly after release of the hand buttons when set on continuous. Although the machine was designed to stop following release of the hand buttons, the addition of the so-called CR–6 relay made it possible for a race circuit to be established if the hand buttons were released virtually simultaneously. If this were the situation, the machine would begin stroking continuously. It was thus defendant's contention that at the time of the accident the press was set on continuous and Smith released his hand buttons simultaneously. Thereafter a race circuit was established and the machine began the repeated stroking.

Defendant's further contention was that the accident would not have occurred were it not for the addition by Industrial Gasket Company of the CR–6 relay. Another possibility advanced by defendant was that the race circuit could be established if the machine were set on single stroke and that this was the result of changes made by Industrial Gasket after purchase. However, the testimony indicated that this was an unlikely occurrence which would come about only on a convergence of several different circumstances.

An additional position advanced by plaintiff was that the press should have been manufactured with an "Arm and Ready Button," so that if it was set on continuous, it would not turn at all unless the operator first depressed the arm and ready button. Thus the operator would be aware that his press was on the continuous cycle before it began to stroke. The plaintiff also maintained that the press should have come equipped with a key lock system, which would prevent a change in the setting unless a key was used. He argues that this prevents any accidental change in the setting and it further insures that the operator is aware when his machine is on continuous. He maintains that one or both of these design omissions had made such settings possible, and that even if the machine was on continuous at the time of the accident, the setting would not have caused the injury.

The theories that are outlined briefly above are not of great consequence here except to give a picture of the issue that was presented to the jury. The case is on review here for the purpose of ascertaining whether the trial court committed error in the giving of instructions. The plaintiff complains that the trial court was guilty of error in this regard.

The defendant disputes this and argues that the trial court should have directed a verdict in any event and thus any errors in instructions are not prejudicial.

Three points are raised by the appellant in his brief. These are:

I. That the trial court erred by instructing the jury that the appellee's duty was to comply with the state of the art of the industry existing at the time the punch press was manufactured, as given in the court's instruction number 3.

II. That the trial court erred by refusing to give plaintiff's requested instruction numbers 3 and 4 concerning the combination of acts which caused injury to the plaintiff.

III. That the trial court erred by refusing to give plaintiff's requested instruction number 14 concerning the manufacturer's design of the product.

## I.

DID THE TRIAL COURT ERR IN THE GIVING OF INSTRUCTION NUMBER 3, HAVING TO DO WITH THE STATE OF THE ART OF THE INDUSTRY EXISTING AT THE TIME THE PUNCH PRESS WAS MANUFACTURED?

The state of the art issue is relied upon most strongly by the plaintiff and thus instruction number 3 given by the court must be examined.

### A. *Evidence Which Dealt With State of the Art*

There was very little testimony on this issue. It was mentioned briefly on three occasions and the issue was raised on two of these occasions by counsel for the plaintiff who is now complaining about its presence.

The first mention of it was when the plaintiff was examining Mr. George Greene, Jr., an expert witness called by the plaintiff. Counsel asked Mr. Greene whether the machine had any continuous arm and ready button on it, and the answer was that it did not. Then he was asked whether the technology that was used to put the continuous arm and ready button on the current Minster machines was available in the industry and available to Minster back in the early 1950's, when the machine in question was made. The answer was that it merely required the installation of another switch. The question was then asked about a key lock system and whether the technology required for that system was available back in the 1950's when Minster made the machine in question. The answer was that such technology was available at that time but that this machine did not have such a key lock system. Counsel for Minster cross examined Mr. Greene and established that, in fact, a key lock system was typical in the industry and he then suggested that the key lock was left off the press number 4703 simply because Western Electric so demanded.

A further introduction of evidence by the plaintiff having to do with the subject of state of the art occurred in the cross examination of Robert Jordan by counsel for plaintiff. The question was asked whether other features could have been added at the time that the machine was manufactured, such as an arm and ready button. The answer was that it could have been.

The next question was whether or not, in 1950, Minster had the technological ability to install such a system on its machines as the continuous arm and ready button. The answer was that the question was a philosophical one. The witness said that he supposed that "we had the technology to go to the moon in 1925 had we chosen to pursue it, but we didn't." The next question was "All right. The whole point was that Minster chose not to put an arm and ready button on this machine, didn't they?" The answer was that "Chose is a difficult word at that point. There wasn't any choosing. Such a system was unknown in the industry at that time. And, I think that's a fair question—it wasn't a matter of choosing or not choosing." Counsel then asked "Well, if you had the technological ability to do it and you wanted to protect the worker * * * you put a continuous arm and ready button on it * * *, isn't that right? * * * That

could have been put on and could be put on any press."

As the result of further questioning of the witness Jordan, by counsel for the defendant, he said that the arm and ready button did not exist and was not a part of the state of the art of the industry in 1955. Further testimony from the defendant was to the effect that the arm and ready buttons came into use only recently and that a recognized alternative to the use of that system was the use of the hand buttons which required continuous pressure to keep the machine stroking continuously. The machine in question had such hand controls.

One further question from counsel for the defendant directed to an expert witness, Mr. Holland, who had been called by the defendant, referred to the state of the art issue. Holland was asked whether or not he had an opinion as to the control circuitry as it existed in 1955 and shipped by Minster Machine as to whether it met, fell below, or exceeded the state of the art for the industry at that time. Mr. Holland said that he did have an opinion on it and when asked what it was he said that his opinion was that it exceeded customary controls built in 1955.

Notwithstanding that both parties had referred to the question of state of the art at the time of the manufacture of the machine in question, it was not mentioned at all by defense counsel in closing arguments. It was mentioned very briefly by counsel for plaintiff.

## B. The Instructions Which are Here Relevant.

The trial court gave a lengthy instruction on the elements of a cause of action for products liability. The court defined first the elements of a claim based on products liability, saying that Oklahoma law requires the plaintiff to show that a defect in the product which existed when it left the defendant's control made the product unreasonably dangerous and was the proximate cause of injury to the plaintiff. The court then went on to define the term "unreasonably dangerous" as meaning:

that the product must be dangerous to an extent beyond that which would be contemplated by the ordinary user of the product, with the ordinary knowledge common to the community as to the characteristics of the product, that is, knowledge which is common to the foreseeable class of persons who use the product.

The trial court continued, saying that:

if a product does contain a defect, and the art of the industry at the time of the manufacturer was such that, by alternate design, construction or preparation, the product could reasonably have been made less hazardous, then a manufacturer has a duty to adopt such alternative.

The court further said:

In determining whether the punch press in question could feasibly have been made safer, you are instructed that the manufacturer is held to that degree of skill and of knowledge of developments in the art of the industry then existing when the product was manufactured.

Also in instruction number 3, the court commented on proximate cause, contributory negligence, modification by third persons, and unintended, unforeseeable use. Following the giving of the instructions, counsel for plaintiff objected to instruction number 3 as follows:

[T]he instruction should tell the jury that the art of the industry is something to be considered by the jury but the instruction seems to set out an absolute test, so on that basis I object to it.

It is to be recalled that the first sentence of the trial court's instruction number 3 states that if a product contains a defect, a manufacturer must adopt any available, reasonable alternative; the jury was told that if a defect exists and the art of the time of the manufacture was such that by alternate design, construction or preparation the product could have been made less hazardous, in that event a manufacturer has a duty to adopt such alternative. We fail to see any prejudice to the plaintiff as a result of the giving of this instruction for the reason that it is positive from the stand-

point of the plaintiff. It places the burden on the defendant to correct a defect if it is possible based on the state of the art to do so.

The second sentence is somewhat different. It states that in making a determination whether it feasibly could be made safer or less hazardous, the manufacturer must have used existing skill and knowledge. Here again the burden is placed on the manufacturer to at least use existing skill and knowledge. Failure to do so places the manufacturer in violation of the duty imposed by the first sentence if the product is also found to contain the defect. Thus, the instruction stresses the duty of the manufacturer. The trial court did not articulate any intention to set forth a defense based on compliance. There is no mention that the defendant is to be exonerated if it shows compliance. It is highly doubtful whether the jury would interpret this as a defense peculiarly available to the defendant since it outlines a duty which is owed by the defendant and fails to mention any benefit available to the defendant.

It is the contention of the plaintiff here that the state of the art evidence is not even relevant in a products liability action and it is contended that we should limit or overrule *Bruce v. Martin-Marietta Corp.*, 544 F.2d 442 (10th Cir. 1976).

In *Rucker v. Norfolk & Western Railway Co.*, 77 Ill.2d 434, 33 Ill.Dec. 145, 396 N.E.2d 534 (1979), the court held evidence of compliance with federal safety standards was admissible evidence in a defective design case. The court there indicated that the great weight of authority favors admission of such evidence and one of the cases cited was *Bruce v. Martin-Marietta Corp., supra. Id.* at 536. *Walker v. Trico Manufacturing Co., Inc.*, 487 F.2d 595 (7th Cir. 1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974) contains language that the state of the art evidence is admissible under Illinois law on rebuttal where plaintiff first raises the issue.

Plaintiff has argued that even if evidence regarding the state of the art is admissible, that compliance with the state of the art should not be an absolute defense to a claim based on products liability. The court, however, did not instruct the jury that the state of the art should constitute an absolute defense. There is no way that it can be read so as to reach the conclusion complained of. In any event, we need not guess as to what the Oklahoma Supreme Court will rule on this issue because the challenged instruction does not state that compliance with the state of the art is an absolute defense.

■ If state of the art is understood to mean simply the custom and practice in an industry, and as we view it, this is a proper meaning to be attributed to it, then compliance with such standard does not constitute an absolute defense to a products liability action. This is the rule applicable in negligence cases. See Prosser, *Law of Torts*, 166 (4th ed. 1971); *Gilmore v. St. Anthony Hospital*, 598 P.2d 1200, 1205, n.6 (Okla.1979); *Fabian v. E. W. Bliss Co.*, 582 F.2d 1257, 1261 (10th Cir. 1970) (law of New Mexico applied). A similar result would seem to be applicable in products liability cases. Thus, if a product is found to be in a defective condition unreasonably dangerous to the user, the manufacturer is not to be excused from liability simply because other manufacturers are producing similar products.

■ It seems clear that the trial court in our case, in instructing on state of the art, meant to communicate that it was the custom and practice of the industry that it was dealing with. That being so, it is equally clear that compliance with the standard does not constitute an absolute defense to a products liability case. We are satisfied in this case that the instruction in issue did not advise the jury that compliance with the state of the art constituted an absolute defense. Indeed, that issue is not before us. It is the possible ambiguity of the instruction that is being urged. In any event, an obvious meaning is that the minimum duty to employ state of the art technology without creating a defense based on such technology was contained in the judge's instruction. Giving plaintiff's reading full consideration, the instruction only advises that

the state of the art determines feasibility of safer alternatives. The jury was never told that the lack of safer alternatives precluded liability. Industry custom may be relevant to proof of feasibility of alternatives, but it is not conclusive. It is also to be noted that the jury was properly instructed on the elements of a strict liability claim, including guidance regarding "defective" and "unreasonably dangerous."

The plaintiff relied on the failure to incorporate a double relay as the cause of the accident. Defendant, on the other hand, urged that the accident would not have occurred in the absence of the changes made by third parties.

One is inclined to conclude that the defendant's evidence of substantial changes in the particular press made after it left the control of Minster, together with the substantial lapse of time after the product left the possession of defendant, may account for the result. See *Gardner v. General Motors Corp.*, 507 F.2d 525 (10th Cir. 1974).

In any event defendant's theory of the case did not rely on compliance with industry custom; such fact was not even mentioned in defendant's final argument.

Therefore, for the reasons stated, we are satisfied that the instruction on state of the art does not constitute reversible error in this case.

## II.

### WHETHER THE INSTRUCTION ON PROXIMATE CAUSE WAS ERRONEOUS?

■ The instruction which was requested by plaintiff reads as follows:

The "proximate cause" of any injury as that expression is used in these instructions, means the cause which in its natural and continuous sequence produces the injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it brings about the injury.

You are instructed that if a defect in the punch press manufactured, designed or sold by defendant combined with the acts of another to cause the loss from which the plaintiff . . . suffered, then defendant is responsible for the entire result, even though the defect in the punch press as manufactured, designed or sold by defendant alone may not be the sole cause of the loss.

Therefore, if you should find under all the evidence in this case, that the loss suffered by plaintiff . . . was caused by the combined effect of the defect in defendant's punch press which rendered it unreasonably dangerous beyond the contemplation of the ordinary user, and the acts of any other persons or entities, you should find in favor of the plaintiff . . . and against the defendant.

The instruction which the court gave on proximate cause reads as follows:

If you have found that the punch press in question was defective and unreasonably dangerous to the user, then you must further determine whether the plaintiff has proved that the defect was the proximate cause of the accident. The proximate cause of an accident is that cause which in natural and continuous sequence contributed to producing the accident. It need not be the only, nor the last, cause but must be such cause as without it the result would not have happened. The mere possibility, however, that any defect might have caused the accident is not enough.

The court further instructed that any contributory negligence of the plaintiff was not a defense, and that the defendant had the burden of proving the defense that modifications made by third parties were the cause of plaintiff's injuries. In our judgment the instruction which the court gave was appropriate under the circumstances because it fulfilled its mission, in that it told the jury what factual cause was. The plaintiff's tendered instruction could have been very confusing to the jury and could have caused them to attribute the injury to changes that were made at various stages in this press to contributing causes that did not prevent the recovery.

In truth this is properly a part of a proximate cause instruction. The case of *Fields v. Volkswagen of America, Inc.*, 555 P.2d 48 (Okla.1976), which was relied upon by the plaintiff, made clear that any other cause had to concur with the cause under consideration in order for it to be effectual.

### III.

### DID THE TRIAL COURT ERR IN REFUSING TO GIVE PLAINTIFF'S INSTRUCTION NUMBER 14?

■ The instruction in question reads as follows:

> You are instructed that a defendant may be held liable for a defect in design or a change in design furnished to a user of the machine by the defendant subsequent to the sale of the machine if you find that the design or design changes were defective, were furnished by the defendant or under the control of the defendant and said design or design changes made the punch press unreasonably dangerous to users and said defect was the proximate cause of the damage complained of.

The crux of this instruction is that defendant may be held liable for defects in design furnished to the user of the machine by the defendant subsequent to the sale of the machine if it is found that the design or design changes were defective, were furnished by the defendant or under the control of the defendant and said design or design changes made the punch press unreasonably dangerous to users and said defect was the proximate cause of the damage complained of. The most that was suggested by the evidence was that persons at Industrial Gasket may have called persons at Minster Machine from time to time regarding repair and alteration of various presses. The precise content of the advice received from Minster was never described. It was never established that any of the changes in press number 4703 were made with Minster's advice. There was only one possible exception to that and that is the addition of a dual solenoid, but the solenoid was not argued to have been a factor in the malfunction of the press by either plaintiff or defendant.

Under the circumstances presented, no question of fact was present for submission to the jury, even if plaintiff's theory of "continuing design" were to be accepted. It was not erroneous, therefore, for the trial court to refuse to give plaintiff's instruction number 14.

Our conclusion is that the judgment of the district court should be and the same is hereby affirmed.