990 F.2d 426
 61 USLW 2708, Prod.Liab.Rep. (CCH) P 13,454
 WESTCHEM AGRICULTURAL CHEMICALS, INC., Appellant,
v.
FORD MOTOR COMPANY, a foreign corporation; Westlie Motor
Company, a corporation, Appellees.
FORD MOTOR COMPANY, Third Party-Plaintiff,
v.
UNITED AGRI PRODUCTS, INC., a corporation, Third Party-Defendant.
 No. 92-1960.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 14, 1992.
Decided April 6, 1993.
Rehearing Denied May 6, 1993.
 
 Michael G. Mullin, Omaha, NE, argued (Martel J. Bundy and Keith P. Larsen, Omaha, NE, Randall J. Bakke, Bismarck, ND, and Thomas W. Conklin, Chicago, IL, on the brief), for appellant.
 John M. Thomas, Dearborn, MI, argued (Thomas E. Rutten, Devils Lake, ND, for appellee Westlie Motor Co.; William Sampson and John T. Steere, Overland Park, KS, and John M. Thomas, Dearborn, MI, for appellee Ford Motor Co., on the brief), for appellees.
 Before MAGILL and BEAM, Circuit Judges, and LARSON,* Senior District Judge.
 MAGILL, Circuit Judge.
 
 
 1
 Westchem Agricultural Chemicals, Inc., (Westchem) appeals from the trial court's order granting summary judgment to Ford Motor Company (Ford) and Westlie Motor Company (Westlie). Westchem had suffered damages from a fire originating in a pickup manufactured by Ford, and filed a complaint alleging Ford and Westlie were liable for the damages under theories of negligence, defective design, failure to warn, and breach of warranty. We affirm the trial court's grant of summary judgment on all claims against Ford. We affirm the grant of summary judgment on all claims against Westlie except the claim that Westlie negligently maintained the pickup. On that claim alone, we remand for proceedings on the merits.
 
 I. BACKGROUND
 
 2
 Westchem is a Montana corporation engaged in the business of storing agricultural chemicals for sale to farmers and farm products retailers. In 1986, Westchem purchased from Westlie, a North Dakota corporation which sells and services motor vehicles, an F-250 Supercab pickup manufactured by Ford.
 
 
 3
 The pickup was factory-equipped with a trailer tow wiring harness, which is designed to provide power for a trailer's lights. The wires in the trailer tow wiring harness are separately insulated, and one of the wires is a 12-gauge "hot" wire, which means it is continually energized even when the pickup engine is not running. The wires in the harness are routed from the front of the pickup to the rear and fed into a plug. To use the trailer tow wiring harness for a trailer, a consumer needs only to mate an appropriate plug from the trailer to the harness plug. The 12-gauge electrical circuit containing the hot wire was protected against short circuits by a 16-gauge fusible link. The 16-gauge fusible link is a short section of wire four gauges smaller than the 12-gauge circuit. The fusible link separates in the event of a short circuit, breaking the circuit before excessive heat can build up in the rest of the circuit. This is appropriate circuit protection for the 12-gauge hot wire, and conforms to Society of Automotive Engineers (SAE) standards.
 
 
 4
 The new F-250 pickup purchased by Westchem was primarily used by a Westchem employee, Thomas Schulz, in the course of his employment. Soon after the pickup was purchased, Schulz removed a "topper" or camper shell from an older pickup owned by Westchem and mounted the topper on the new F-250 pickup. The topper was manufactured by Glasstite, Inc., which has no connection to either Ford or Westlie.
 
 
 5
 Two weeks later, Schulz connected the topper's dome light to the pickup's electrical system.[1] Schulz purchased a length of 16- or 18-gauge wire at K-Mart, attempting visually to match the "pigtail" connector wire extending from the dome light. Schulz attached the K-Mart wire to the topper dome light, and routed the wire along the bottom edge of the topper to the undercarriage of the pickup. He then wrapped the K-Mart wire several times around the wires in the trailer tow wiring harness and the nylon gas line.[2] Using an electrical tester, Schulz searched for a hot wire in the electrical system of the pickup. He found the 12-gauge hot wire in the trailer tow wiring harness, cut the hot wire and used a wire nut to connect the 16- or 18-gauge K-Mart wire.
 
 
 6
 Schulz did not add a fusible link or fuse to the new circuit he created in order to protect it in the event of a short circuit. Because the K-Mart wire added by Schulz was either the same size or smaller than the 16-gauge fusible link protecting the circuit in the trailer tow wiring harness, the fusible link could not protect the circuit Schulz added. Therefore, in the event of a short circuit in the K-Mart wire, the entire circuit would increase in heat until reaching its 1900 degree Fahrenheit melting point and separating.
 
 
 7
 On April 4, 1987, Schulz parked the pickup in Westchem's warehouse. While making a phone call in the warehouse office, a fire broke out in the undercarriage of the pickup. The evidence viewed in the light most favorable to Westchem shows that the fire was caused by a short circuit in the K-Mart wire added by Schulz. Because Schulz had failed to protect the circuit he added, the K-Mart wire continued to heat up to its 1900 degree Fahrenheit melting point, severed the nylon fuel line around which it was wrapped, and ignited the gas. Schulz and the Minot fire department were unable to extinguish the fire. The fire ultimately destroyed the warehouse and its contents. In addition to losses from destruction of the warehouse, Westchem incurred costs for environmental cleanup.
 
 
 8
 Westchem sued Ford and Westlie for damages suffered from the fire. Westchem alleged Ford is liable under the theories of negligent design, strict liability in tort, negligent and strict liability failure to warn, failure to recall, and breach of warranty. Westchem also requested punitive damages from Ford. Westchem alleged Westlie is liable under the theories of negligence, breach of warranty, strict liability, negligent and strict liability failure to warn, and failure to instruct. Ford moved for summary judgment, arguing the fire was caused by the addition of the topper. The trial court granted Ford's motion for summary judgment, and entered an order dismissing all causes of action against both Ford and Westlie. Westchem appeals from this order.
 
 II. DISCUSSION
 
 9
 We review the grant of summary judgment under the same standards as the district court. Kegel v. Runnels, 793 F.2d 924, 926 (8th Cir.1986). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is granted only when "the moving party has established the right to a judgment with such clarity as to leave no room for controversy." Vacca v. Viacom Broadcasting of Mo., Inc., 875 F.2d 1337, 1339 (8th Cir.1989) (citation omitted). When the moving party produces credible evidence that establishes there is no genuine issue of material facts, the opposing party must produce specific facts demonstrating a genuine issue for trial. Elbe v. Yankton Indep. Sch. Dist. No. 1, 714 F.2d 848, 850 (8th Cir.1983). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We view all facts and reasonable inferences in a light most favorable to the nonmoving party, Westchem. Id. at 255, 106 S.Ct. at 2513.
 
 
 10
 We first note Westchem has presented no evidence that the pickup was not safe before the topper dome light was improperly spliced to the trailer tow wiring harness. The 12-gauge wire in the trailer tow wiring harness was adequately protected according to SAE standards by the 16-gauge fusible link. Additionally, Westchem produced no evidence that the nylon tubing was not safe for use as a fuel line before the dome light wire was wrapped around it.
 
 A. Negligent Design
 
 11
 Westchem claims Ford negligently designed the pickup because the pickup could not accommodate foreseeable and known uses by consumers. As the threshold step in this negligence claim, Westchem must prove that Ford had a duty to design its pickup to protect against damage from the unsafe manner in which Westchem's topper dome light was connected. See Carlson Homes, Inc. v. Messmer, 307 N.W.2d 564, 566 (N.D.1981) (stating duty is necessary element in a negligence claim). Westchem argues that Ford had this duty because under Johnson v. American Motors Corp., 225 N.W.2d 57 (N.D.1974), Ford has a duty to protect consumers against foreseeable misuse of its vehicles. In Johnson, however, the North Dakota Supreme Court was facing the issue of whether an automobile manufacturer has a duty to design its vehicles to protect occupants in the event of an accident. The type of misuse addressed in Johnson--an accident--is a misuse directly related to normal operation of a vehicle. In the present case, altering the pickup's electrical system is not in any way related to the normal operation of the pickup. We do not believe that the rule of law regarding foreseeable misuse established in Johnson extends to imposing a duty upon manufacturers to design vehicles in anticipation of consumers splicing into a vehicle's adequately protected electrical system to add aftermarket electrical equipment in an outrageously unsafe manner.
 
 
 12
 There are no disputed facts relevant to determining Ford's duty. Therefore, whether a duty exists is a question of law for the court to resolve. See Holter v. City of Sheyenne, 480 N.W.2d 736, 737 (N.D.1992). North Dakota has not indicated it would impose upon Ford the duty to design its vehicles to protect against harm resulting from improperly installed aftermarket equipment which Ford has not designed, manufactured, marketed, or sold.[3] We decline to impose this duty upon Ford.
 
 
 13
 We believe sound public policy supports this decision. Imposing this duty upon Ford would require Ford to anticipate improper installation of all foreseeable aftermarket equipment and to ironclad its vehicles against every conceivable harm from improper installation. Cf. Baughman v. General Motors Corp., 780 F.2d 1131, 1133 (4th Cir.1986) (finding vehicle is not defective on ground that it accommodates defective aftermarket equipment; manufacturer did not put defective component in stream of commerce, has not derived any benefit from its sale, and has not tested component); Spencer v. Ford Motor Co., 141 Mich.App. 356, 367 N.W.2d 393, 396 (1985) (far-reaching undesirable consequences would result from finding that a vehicle is defective on the ground that it could accommodate dangerous components from other manufacturers).
 
 
 14
 We find Ford had no duty to anticipate improper installation of Westchem's topper dome light and to design the pickup to protect against damage resulting from improper installation. A claim of negligence fails when no legal duty exists. Schleicher v. Western State Bank of Devils Lake, 314 N.W.2d 293, 298 (N.D.1982). Therefore, the trial court correctly granted Ford summary judgment on Westchem's claim regarding negligent design.
 
 B. Strict Liability
 
 15
 Westchem also claims Ford is liable under a theory of strict liability in tort. In order to recover under this theory, Westchem must prove the pickup was defective and unreasonably dangerous. See Morrison v. Grand Forks Hous. Auth., 436 N.W.2d 221, 223-24 (N.D.1989). Whether a product is defective is determined on a case-by-case basis, and North Dakota approved use of language incorporating comments g,[4] h,[5] and i[6] of Restatement (Second) of Torts § 402A to describe what constitutes a defective product. See id.
 
 
 16
 As noted above, the pickup was not dangerous before Westchem's topper dome light was improperly installed. The pickup's fuel and electrical systems performed "reasonably, adequately and safely, the normal, anticipated or specified use to which [Ford intended] that [they] be put...." Hudson v. Snyder Body, Inc., 326 N.W.2d 149 (Minn.1982) (cited with approval by Morrison, 436 N.W.2d at 224). The pickup was "safe for normal handling and consumption." Farr v. Armstrong Rubber Co., 288 Minn. 83, 179 N.W.2d 64 (1970) (cited with approval by Morrison, 436 N.W.2d at 224). The pickup "performed adequately and posed no unreasonable danger beyond the contemplation of the ordinary user...." Morrison, 436 N.W.2d at 224. In our view, an ordinary user of the vehicle would have understood that it is dangerous to alter the electrical wiring of a vehicle. When Westchem received the pickup, it was not in a condition which Westchem would not have contemplated. On the facts of this case, we find that reasonable persons could not find the pickup to be defective. Therefore, the trial court correctly granted Ford summary judgment on Westchem's strict liability claim.
 
 
 17
 Again, this conclusion comports with sound public policy. The purpose of strict liability is to cause manufacturers to bear the costs of injuries from defective products instead of the " 'injured persons who are powerless to protect themselves.' " Johnson, 225 N.W.2d at 66 (quoting Greenman v. Yuba Power Prods., Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901 (1962)). In the case before us, the pickup was safe for its intended uses. The improper installation of the topper dome light was the origin of the damages suffered. Westchem was not powerless to protect itself, and the cost of the damages should not rest on Ford, who did not choose, recommend, inspect, or test the aftermarket equipment or the manner in which it was installed.
 
 C. Failure to Warn
 
 18
 Westchem next claims that Ford is liable under both negligent and strict liability failure to warn theories. Westchem contends Ford could foresee that an ordinary consumer may not recognize the need for additional circuit protection. Under a negligence theory, Westchem argues Ford negligently breached its duty to warn Westchem that failure to follow proper electrical wiring principles when installing aftermarket electrical equipment could increase the risk of fire. Under a strict liability theory, Westchem argues Ford's failure to warn regarding improper installation of aftermarket equipment rendered the pickup unreasonably dangerous.
 
 
 19
 When existence of a duty rests on factual determinations, the trier of fact should resolve those disputes. Morrison, 436 N.W.2d at 225. However, reasonable minds could not differ about the facts in this case. Therefore, the question of whether Ford had a duty to warn Westchem and whether Ford's failure to warn rendered the pickup unreasonably dangerous is a matter of law for the court to decide. Id.
 
 
 20
 Manufacturers of products which can be dangerous do not automatically owe consumers a duty to warn. Morrison, 436 N.W.2d at 226. For example, the manufacturer of an obviously dangerous knife has no duty to warn consumers of the danger it presents. Morrison, 436 N.W.2d at 226. Obviousness of danger is one factor which the North Dakota courts consider when determining whether a manufacturer has a duty to warn, Oanes, 476 N.W.2d at 253, and whether the product is unreasonably dangerous, Butz v. Werner, 438 N.W.2d 509, 512 n. 2 (N.D.1989).
 
 
 21
 We consider it obviously dangerous for an ordinary consumer to splice into a vehicle's electrical wiring without consulting a professional. Additionally, the improperly installed aftermarket equipment created the danger; Westchem produced no evidence that the pickup was not safe before the topper dome light was connected.[7] Ford did not recommend splicing into the hot wire, nor was the wire placed in a manner so as to invite splicing. Ford did not manufacture or recommend the topper dome light or the K-Mart wire. Ford did not have an opportunity to inspect or test the light, wire, or the manner in which they were installed. If a duty to warn should rest on any manufacturer, it should rest on the topper manufacturer. The topper manufacturer knows its product best and can instruct in the proper method of installation. As a matter of law, Ford did not have a duty to warn regarding dangers arising from improper installation of the aftermarket electrical equipment in this case.[8] Because existence of a duty is an essential element of a negligence claim, see Schleicher, 314 N.W.2d at 298, the trial court correctly granted Ford summary judgment on the negligent failure to warn claim.
 
 
 22
 Additionally, the pickup was not dangerous to an extent not contemplated by the ordinary consumer. Morrison, 436 N.W.2d at 226. A reasonable consumer would not attempt to alter a vehicle's electrical system without consulting a professional. Ford's failure to warn did not render the pickup unreasonably dangerous. The trial court correctly granted Ford summary judgment on the strict liability failure to warn claim.
 
 D. Other Claims
 
 23
 The pickup is not defective or unreasonably dangerous under the theories discussed above, and served the purposes for which it was designed and sold. Therefore, the claims under breach of warranty, failure to recall, and failure to instruct fail. Westchem's claim that Westlie negligently failed to properly inspect and prepare the pickup prior to delivery also fails. The trial court correctly granted summary judgment on these claims.
 
 
 24
 However, Westchem also claims that Westlie negligently failed to properly maintain the pickup. It alleges Westlie damaged the topper dome light wire while the pickup was being serviced, causing the wire to short and start the fire. Sufficient evidence was produced regarding this issue to raise a question of fact. We reverse and remand on this claim alone.
 
 III. CONCLUSION
 
 25
 Ford had no duty to design its pickup to protect against damage from improperly installed aftermarket equipment, and the pickup was not defective because Ford did not design its pickup in that manner. Additionally, Ford had no duty to warn consumers against improper installation of aftermarket equipment, nor did the lack of warnings make the pickup unreasonably dangerous. Therefore, the trial court correctly granted summary judgment on Westchem's claims against Ford.
 
 
 26
 The court correctly granted summary judgment on all of Westchem's claims against Westlie except the claim for negligent maintenance of the pickup. We reverse and remand for proceedings on the merits of that claim only.
 
 
 
 *
 THE HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 Westchem complains that the trial court erroneously stated that Schulz connected the topper dome light on Westchem's premises when it found that Schulz performed this task in the scope of his employment. The uncontroverted evidence shows that Schulz connected the light at home. However, we note that the evidence reveals that Schulz was a Westchem employee, the pickup and the topper were both owned by Westchem, and the pickup and topper were used by Schulz in the course of his employment. On the basis of these facts, we cannot say that the trial court's conclusion that Schulz wired the truck in the course of his employment was clearly erroneous
 
 
 [2]
 Westchem complains that the trial court erroneously stated Schulz said he wrapped the wire around the gas line. We have reviewed the record, and find no evidence that Schulz made this admission. However, Westchem's expert testified that examination of the pickup reveals the wire was wrapped around the gas line. Therefore, the trial court's statement that the K-Mart wire was wrapped around the gas line is not clearly erroneous
 
 
 [3]
 Westchem contends that North Dakota does impose that duty upon Ford under Oanes v. Westgo, Inc., 476 N.W.2d 248, 252 (N.D.1991). Oanes, however, is inapposite to the present case. In Oanes, the plaintiff was injured by a homemade tool attached to an extension on an auger. Whether the defendant manufacturer had a duty to design the auger to prevent injury from the attachment and to warn regarding the danger of attachments was not at issue in Oanes. The court apparently assumed the manufacturer had this duty. However, the auger extension was designed to hold attachments, and was being used for its intended purpose. Additionally, the manufacturer had previously manufactured and sold an attachment similar in function to the homemade one which caused the injury. In the present case, the pickup's trailer tow wiring harness was designed to serve one purpose, and the harness was improperly spliced to alter it to serve an entirely different purpose. No evidence was introduced that Ford encouraged in any way splicing into the trailer tow wiring harness. Oanes does not indicate that North Dakota would impose upon Ford the duty to protect against damage from the improper installation of the topper dome light
 
 
 [4]
 "The rule ... applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Restatement (Second) of Torts § 402A cmt. g (1965)
 
 
 [5]
 "A product is not in a defective condition when it is safe for normal handling and consumption." Restatement (Second) of Torts § 402A cmt. h (1965)
 
 
 [6]
 "The rule ... applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer.... The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts § 402A cmt. i (1965)
 
 
 [7]
 Westchem contends that it is irrelevant that the pickup did not pose a danger before the topper dome light was improperly installed, and cites to Gardner v. General Motors Corp., 507 F.2d 525 (10th Cir.1974), to support this claim. Gardner concerned a case in which three men died from carbon monoxide poisoning after a camper was installed on a pickup on which the exhaust pipe ended below the floor of the camper. The Tenth Circuit affirmed a jury finding that General Motors Corporation (GMC) had a duty to warn of the danger of carbon monoxide poisoning and breached that duty. The pickup in Gardner apparently posed no danger before the camper was installed. However, any similarity between Gardner and the present case ends with that fact. In Gardner, GMC specifically advertised that the pickup was suitable for installation of a camper, and the injury resulted after the camper was properly installed. In the case before us, Ford did not invite splicing into the hot wire, the topper dome light was improperly installed, and the injury was a direct result from that improper installation
 
 
 [8]
 Westchem contends that North Dakota requires manufacturers to warn consumers regarding danger resulting from foreseeable alterations or modifications of their products. See Witthauer v. Burkhart Roentgen, Inc., 467 N.W.2d 439, 444-45 (N.D.1991); Oanes v. Westgo, Inc., 476 N.W.2d 248, 252 (N.D.1991). However, we do not believe Witthauer and Oanes provide guidance as to whether a duty exists in the present case. In Witthauer, a safety shield was removed from a surgical lamp, allowing the lamp to burn the plaintiff. It was the product itself which injured the plaintiff, not an addition to the product. The court found that the manufacturer could not escape liability because the danger from operating the lamp without the shield was not obvious and a consumer foreseeably could remove the shield. In the present case, it was the wire attached to the pickup, not the pickup itself, which caused the danger, and the danger of splicing into an electrical circuit is obvious. Oanes involved a case in which a homemade tool attached to an extension on an auger extension caused the injury, and the court apparently assumed the manufacturer had a duty to warn regarding putting attachments on the extension. However, the auger extension was designed to hold attachments, and was being used for its intended purpose. Additionally, the manufacturer had previously manufactured and sold attachments similar in function to the homemade one. In the present case, the pickup's trailer tow wiring harness was designed to serve one purpose, and it was improperly altered to serve an entirely different purpose. We do not believe that Witthauer and Oanes indicate that North Dakota courts would reach a different conclusion than we reach in this case