UNITED STATES of America,
Plaintiff-Appellee,

v.

Willie D. KING, Fred Lee Jones and
Tellis Jones, Defendants-Appellants.

No. 75–2840.

United States Court of Appeals,
Fifth Circuit.

June 1, 1976.

Rehearing and Rehearing En Banc
Denied July 12, 1976.

William D. Harrell, Bainbridge, Ga., for King.

B. Sam Engram, Jr., Albany, Ga., for Fred Jones.

John C. Swearingen, Jr., Ben B. Philips, Columbus, Ga., for Tellis Jones.

Ronald T. Knight, U. S. Atty., C. Nathan Davis, Samuel A. Wilson, Jr., Asst. U. S. Attys., Macon, Ga., for plaintiff-appellee.

Before DYER and CLARK, Circuit Judges, and KRAFT *, District Judge.

KRAFT, District Judge:

Appellants, Willie D. King, (King) Fred Lee Jones and his brother, Tellis Jones, were charged with (1) conspiracy to engage in the business of dealing in firearms without being licensed to do so,[1] and (2) having engaged in that business without a license.[2]

The Jones brothers were convicted of the substantive charge and all three appellants were convicted of conspiracy.

Two issues are raised by all appellants, one issue by two appellants and the remaining issues are separately raised only by Tellis Jones. We shall deal first with the issues commonly raised.

■ The first contention made by all three appellants is that the evidence was insufficient to support the verdicts. We disagree. If, taking the view most favorable to the Government, there was substantial evidence to support the verdicts, they must be sustained. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

From our full review of the evidence it is apparent that the jury was warranted in finding the following facts: Fred Lee Jones, a police sergeant in Donaldsonville, Georgia, and his brother, Tellis Jones, were cousins of King. Tellis Jones and King were usually employed outside Donaldsonville, either on the premises of Action Movement Fund or the nearby premises of Action Movement, Inc. The Fund had been founded by Dr. Dallas Moore, an uncle of the Jones brothers and a purported spiritual healer, who conducted his services as, or under the auspices of, Action Movement, Inc. Dr. Moore's services attracted substantial numbers of people, many of whom came by bus from other states, including New Jersey and New York. For food and shelter the visitors frequently used facilities available through Action Movement Fund. The existence of a bus station, a parking lot and the frequent presence of large numbers of strangers in this rural setting provided a ready entree for the undercover agents of the Alcohol, Tobacco and Firearms Bureau (AT&F) in their investigation of the suspected unlawful activities of the appellants.

Between March 17, 1969 and November 29, 1974 Tellis Jones purchased more than ninety firearms. From February 25, 1971

---

* Senior District Judge of the Eastern District of Pennsylvania, sitting by designation.

1. 18 U.S.C. § 371

2. 18 U.S.C. § 922(a) and (2).

to November 22, 1974 Fred Lee Jones purchased more than sixty firearms. Between November 1, 1969 and March 22, 1974 King bought at least eight firearms. Most of these purchases, mostly handguns of various calibers, were made from Hatcher's, a sporting goods store in Donaldsonville.

One of the handguns purchased by Tellis Jones on May 28, 1969 was seized by police in Newark, New Jersey in August, 1970. Another, purchased by Tellis Jones on July 18, 1972, was seized by police in the same city later that year. Two handguns purchased by Fred Lee Jones on successive days in October, 1973 were seized by police in Rochester, New York in December of the same year.

On February 11, 1974 Tellis Jones assured Joseph Forbes (Forbes), an undercover agent of AT&F, in response to the latter's inquiry, that guns were easy to procure and that he could get them for Forbes in Donaldsonville. Forbes then arranged to buy two .25 cal. automatic pistols, paid Jones his quoted price of $80 and agreed to meet Jones, as the latter requested, in the early afternoon. When they met, as arranged, Jones gave him two .25 cal. automatic pistols and requested an additional $20, which Forbes paid. In parting, Forbes expressed his intention to return in about a month to pick up more guns. Jones quoted him a price of $140 on a .44 cal. magnum and told Forbes to write him or call him at a telephone number he then gave Forbes.

Forbes returned on March 21, 1974 and met Tellis Jones about 6:00 P.M., telling him he wanted to get more guns. Jones said it was too late; that everything was closed. He instructed Forbes to meet him the next morning. They met again the following morning at a parking lot near Dr. Moore's house. Jones asked Forbes what type guns he wanted and was told a .357 cal. magnum, a .22 cal. and a .32 cal. Jones made some calculations and said the price would be about $212. Forbes gave him $215 and was told to await Jones' return. Jones reappeared about an hour later, told Forbes to wait a moment, went to his truck and came back with a box containing a .357

cal. magnum revolver, which he delivered to Forbes. Jones said he was only able to pick up one gun at the gun shop, because an F.B.I. agent was then in the shop; that he would return to the shop about 1:00 P.M. and get the other two guns. After a moment or so, Jones walked to another truck, a Ford bearing a fish decal, in which his brother, Fred Lee Jones, was sitting. He returned to Forbes shortly, carrying a small box, which he gave to Forbes. Therein was a .32 cal. revolver. Jones told Forbes that his brother (Fred Lee Jones) would pick up the .22 cal. for Forbes later and that Forbes should remain at the parking lot. Forbes stayed there until about 4:00 P.M. and, not having been contacted by either of the Jones brothers, asked another man (King) in the immediate vicinity if he had seen Tellis Jones. King told Forbes that Tellis had gone, but that Tellis' brother was looking for Forbes and had a pistol for him. Forbes said he didn't know Tellis' brother. King said Tellis' brother was probably at the police station. Forbes indicated his disinclination to go there and King said he would go with him. Forbes and King went to the police station in Forbes' truck. There Forbes saw Fred Lee Jones, in uniform, sitting in a police car. King alighted from Forbes' truck and walked toward the police car. Fred Lee Jones got out of the police vehicle to meet King and the two conversed for a time. King then walked over to Fred Lee Jones' truck nearby, the Ford with a fish decal, and removed a brown paper bag therefrom. He walked back to Forbes' truck and gave Forbes the bag in which was a .22 cal. revolver. The business records of the sale at Hatcher's indicate that this firearm was sold to Willie D. King on the same day. The evidence was sufficient to support a finding that King was the purchaser, though there was conflicting evidence on the authenticity of his purported signature on the document.

In late March, 1974, Elisha Shepard (Shepard), another undercover employee of AT&F, went to the police station in Donaldsonville, seeking Fred Lee Jones. There he met Jones, who wore the uniform and insignia of a police sergeant. Jones accompa-

nied Shepard outside. Shepard told Jones that a fellow from Newark, New Jersey had told him Jones had guns for sale. Jones said "yes". Shepard told Jones he was just out of prison and "didn't want to do no paper work." Jones assured him that he should not worry; that Jones could take care of it. Jones then asked Shepard how many guns he wanted. Shepard indicated two, but stated that he wanted to see them, so he could see just what he wanted. Jones instructed Shepard to follow him. Shepard followed Jones, who was in his police car, to Jones' home. On arrival Jones told Shepard to wait, then entered the rear of his home, unlocked the front door and invited Shepard in. He showed Shepard two .22 cal. revolvers which Jones said Shepard could have for about $34.95 a piece. He also showed Shepard a .32 cal. pistol, which Shepard declined because of the price Jones quoted. Shepard inquired about a good .38 cal. revolver and Jones said he would sell him his .38 Smith & Wesson, the service gun Jones was then wearing, for $75. Shepard said he did not want to pay that much, but bought the two .22 caliber firearms from Jones for $34.95 each. Shepard then told Jones he might want more guns later and inquired how he could contact Jones. Jones told him to contact Jones at the police station and also wrote on a piece of paper a telephone number at which Shepard could call him.

Shepard called the number Jones had given him on January 28, 1975 and talked with Jones, telling him he wanted to order some guns, two 12 ga. automatic or pump shotguns, a .357 cal. magnum revolver and ten .22 cal. Saturday night specials. Jones said he had to have the money first to enable him to buy the ten Saturday night specials, but said he thought he already had the rest of the firearms on hand. Jones told Shepard to call back later to make sure that Jones was able to get the firearms requested. Shepard called Jones back on the following Friday and was told by Jones that he had all the firearms. Shepard told Jones he was unable to come himself and would send his nephew, Willie, to pick up the guns.

On January 31, 1975, Willie Wright, (Wright) another undercover agent of AT&F, went to Donaldsonville, made a telephone call to the police station and then went there, looking for Fred Lee Jones. He found Jones outside the police station talking to someone. Fred Lee Jones came over to Wright's car and told Wright he was expecting him. Wright asked "could I cop some weapons, firearms." Jones asked whether Wright was "Willie". Wright said he was. After some further irrelevant conversation, Jones said he had some weapons for sale and instructed Wright to follow him, first to the bus station, then to Jones' house. Upon arrival at Jones' house, Jones opened the trunk of his car and showed Wright weapons that Jones said were for sale, to wit, seven rifles and three handguns. Jones quoted the price for the firearms and Wright pretended he could not remember them all, whereupon Jones wrote them down, together with the prices for other firearms that Jones said he could get for Wright, if the latter wanted to buy them. Wright said he would have to go and get some money. Wright left and shortly thereafter Fred Lee Jones was arrested.

█ There was ample evidence that Tellis Jones and Fred Lee Jones had, in concert, been engaged in the business of dealing in firearms for several years and that neither had ever been licensed. The existence of a conspiracy so to engage in that business was a reasonable inference to be drawn from the concert of action. While the evidence against King was substantially less in volume, there was sufficient evidence to enable the jury to find beyond a reasonable doubt that King knew the conspiracy existed and the nature of that conspiracy and that his participation and his acts were intended to further the objects of the conspiracy. See *United States v. Morado* (5 Cir. 1972), 454 F.2d 167, 175; *Causey v. United States* (5 Cir. 1965), 352 F.2d 203.

█ Though all appellants now assert that the denial of the motion for mistrial was error, it is noted that the motion was

made only by counsel for Tellis Jones and that the only reason advanced to support the motion was that "Your Honor has commented on the evidence from the bench."

The episode stemmed from the confused and confusing interrogation[3] of Brazil, an agent of AT&F, by Tellis Jones' counsel, which the trial judge sought to render comprehensible by accurate reference to the prior testimony of the witness, Forbes, and by the suggestion that counsel frame more specific questions. It is clear that the trial judge meant only that the three defendants were mentioned in Forbes' testimony and nothing more. The charge clearly and explicitly instructed the jurors that they were the sole judges of the witnesses' credibility; that, in making reference to any evidence, the trial judge was expressing no opinion and that the facts were solely for the jury's determination. The trial judge properly and adequately fulfilled his role. See *United States v. Jacquillon* (5 Cir. 1972), 469 F.2d 380, 387.

Two of the appellants, King and Tellis Jones, next contend that the trial judge abused his discretion in ruling that a prospective expert witness, David Anderson, did not qualify as a "handwriting expert".

The record reveals that Anderson was employed full time by the Social Security Administration in a job unrelated to handwriting. He had taken a correspondence school course in "handwriting analysis", had done such analysis daily as self-study, had no laboratory and trained under no one. Rather than being an "examiner of questioned documents", in the commonly accepted sense, the proffered witness purported to possess expertise in discerning the character or type of a person from that person's writing, not the identity of the scrivener.

■ The preliminary determination whether Anderson qualified sufficiently to enable him to testify as an expert and, so, to express his opinion, was for the trial judge in the exercise of his sound discretion. *De Freese v. United States* (5 Cir. 1959), 270 F.2d 737. We conclude that the discretion of the trial judge was properly exercised. We also note, in passing, that the government's handwriting expert, who had examined the questioned documents and of whose exculpatory conclusions the appellants' counsel had been apprised by the government, was present, was made available to and was called by appellants as their witness.

**3.** "Q  Mr. Forbes said he purchased all of his guns from Tellis Jones, didn't he?

A  The first time he was down here he got the two guns from Tellis. That is what he told me, yes.

Q  Didn't he testify yesterday that he got the others from Tellis as well?

A  He made contact with Tellis and he picked up some at the Police Department where he said that Willie King rode with him to the Police Department and they went and talked with Freddie and got some guns.

Q  That is not what he testified to. Didn't he testify that the guns were purchased from Tellis?

A  I don't understand what you are asking, what Forbes told me or what Forbes testified to?

Q  I am asking you how many of these guns came to you from a special agent and said he bought them directly from Fred Lee Jones? Aren't these the only two, the two you are talking about a while ago that Mr. Shepard delivered to you?

Mr. Brazil, is that a hard question?

THE COURT: Well, I can understand why he is having a hard time answering the question because I remember the man's testimony. He said that one of the men went with him to the Police Department, Freddie Lee Jones came out, there was a discussion and then somebody went to a truck and got the guns and brought them back. In other words, that is the reason he is having trouble answering the questions because all three of the Defendants were apparently involved in some way in that and I can understand—if you will just ask him a question specifically where he can answer it.

MR. SWEARINGEN: Your Honor, may we have the Jury out. I have a motion to make.

THE COURT: You can make it right now.

MR. SWEARINGEN: We would ask that you would declare a mistrial. We would respectfully submit that Your Honor has commented on the evidence from the bench.

THE COURT: I commented on the evidence to the effect that I want Counsel to ask the Witness a question specific in light of the evidence that has been heard so that he can answer it. That is—I commented on it to that extent."

We next review of the contention of the appellant, Fred Lee Jones, that the district court erroneously denied his motion to suppress.

This question, which initially involved the extent of the jurisdiction of the state court judge, who issued the search warrant, is now moot, because, during appellant's trial, the trial judge excluded the evidence sought to be suppressed upon appellant's objection on other grounds.

■ Finally, we consider the several contentions made only by appellant, Tellis Jones. The first of these assails 18 U.S.C. §§ 922(a)(1) and 924(a) as violative of appellant's rights under the Second and Fifth Amendments to the Constitution.

With the argument that the statute violates appellant's right to keep and bear arms we firmly disagree. He was neither charged with nor convicted of keeping and bearing arms. He was charged with and convicted of engaging, without a license, in the business of dealing in firearms and of conspiring with others so to do. See *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939); *United States v. Day* (6 Cir. 1973), 476 F.2d 562.

■ We are unimpressed, as well, by his argument that the terms "dealer" and "dealing in", as employed in the statute, are too vague and indefinite to constitute a valid criminal statute, because no standards are established as to the number of sales, dollar volume thereof, a fixed or other place of business or number of employees. "Business" is commonly understood to mean an activity engaging some of one's time, attention and effort and performed in expectation of profit or other benefit; "Dealing in firearms" is commonly understood as selling and/or trading in firearms, as well as acquiring firearms for sale by purchase and/or trade. *United States v. Williams* (8 Cir. 1974), 502 F.2d 581; *United States v. Day, supra; United States v. Gross* (7 Cir. 1971), 451 F.2d 1355; *United States v. Powell* (8 Cir. 1975), 513 F.2d 1249.

■ Tellis Jones next claims that, absent an interstate nexus, Congress exceeded its power in enacting 18 U.S.C. §§ 922(a)(1) and 924(a), and that, moreover, the evidence established *no interstate nexus.* We hold that the enactment was constitutional and that no evidence of an interstate nexus was required. *United States v. Nelson* (5 Cir. 1972), 458 F.2d 556; *Mandina v. United States* (8 Cir. 1973), 472 F.2d 1110.

■ Appellant, Tellis Jones, further asserts that the trial court unreasonably limited the length of his attorney's closing argument to the jury. We find no merit in this claim.

The entire trial took two days. Upon inquiry by the trial judge, Tellis Jones' counsel said he "would like forty five minutes". His brother's attorney said that that time would be sufficient. King's counsel said that that would be more than adequate. The trial judge said "I was thinking about thirty minutes for each of you" and a total of forty five minutes for the government. He made no order of limitation, nor did he terminate the closing argument of appellant's counsel. Neither at the beginning nor at the end of his argument did appellant's counsel request additional time or indicate, by any application or statement, that he lacked or was deprived of an opportunity fully to present his argument.

Upon careful review of the entire record, we deem the remaining contentions of appellant, Tellis Jones, without sufficient merit to warrant discussion.

The judgments below are affirmed.