The PEOPLE of the State of
Colorado, Petitioner,

v.

Nancy WILLIAMS, Respondent.

No. 88SC302.

Supreme Court of Colorado,
En Banc.

April 9, 1990.
Rehearing Denied May 14, 1990.

Duane Woodard, Atty. Gen., and John Milton Hutchins, First Asst. Atty. Gen., Denver, for petitioner.

David F. Vela, State Public Defender, and Douglas D. Barnes, Deputy Public Defender, Denver, for respondent.

Justice VOLLACK announced the judgment of the Court and delivered an opinion in which Justice ROVIRA and Justice LOHR join.

In *People v. Williams*, 761 P.2d 258 (Colo.App.1988), the court of appeals reversed the defendant Nancy Williams' second degree murder conviction. The court

of appeals held that the district court abused its discretion in refusing to qualify a defense witness as an expert in firearms identification, and remanded for a new trial. *Id.* at 260–61. Because it ordered a new trial, the court of appeals did not consider the defendant's argument that the trial court erred in denying her challenges for cause to prospective jurors. *Id.* at 261. We reverse the court of appeals judgment and remand with directions.

## I.

On April 16, 1982, the defendant was charged in the District Court of Chaffee County with first degree murder after deliberation[1] in connection with her husband's death. *See Williams v. District Court,* 700 P.2d 549, 551 (Colo.1985).[2] After a change of venue the defendant was convicted in the District Court of Fremont County of second degree murder.[3] The defendant subsequently received a new trial based on newly discovered information from a witness who allegedly saw the victim alive after the day the prosecution alleged he was murdered by the defendant. *Id.* The case before this court involves a ruling by the district court in the defendant's second trial.

The prosecution attempted to prove at trial that the defendant murdered her husband with a .250 caliber Ruger Model 77 rifle from her husband's gun collection. The Ruger Model 77 was missing from the victim's gun cabinet when his body was discovered. The Model 77 was discovered at the Buena Vista rodeo grounds approximately two weeks after the murder. The Model 77 and a bullet recovered from a mattress at the crime scene were key pieces of evidence in both of the defendant's trials. During the defendant's second trial the prosecution, as it had in the first trial, called Cordell Brown, a Colorado Bureau of Investigations (CBI) lab agent, to testify. The district court recognized Brown as an expert in the fields of paint

comparison, tool mark comparison, and firearms identification. Brown testified that he examined a smear of paint on the stock of the Model 77 and compared it to three paint samples he took from the defendant's Ford Bronco. Brown concluded that all three samples matched the paint smear on the stock of the Model 77.

Brown testified in the first trial that the bullet recovered from the mattress was so badly damaged that it did not contain sufficient individual markings for identification purposes. At the second trial, however, Brown testified that between the first and second trial he used the Model 77 to fire a test bullet which he later expanded by using a vise to compress the bullet from its nose to its base. Brown testified that after performing this test he was able to match the test bullet with the bullet recovered from the mattress.

During her case the defendant called Robert Lantz to testify. After an initial voir dire, defense counsel asked the district court to qualify Lantz as an expert in the fields of analytical chemistry and firearms identification. The prosecution did not object to having the court qualify Lantz as an expert in the field of analytical chemistry, but the prosecution did object to the defendant's request that the court qualify Lantz as an expert in firearms identification. Following a more extensive voir dire by the prosecution, defense counsel, and the court, the court qualified Lantz as an expert in the field of analytical chemistry but declined to qualify Lantz as an expert in the field of firearms identification.

The court of appeals held that the district court abused its discretion in refusing to qualify Lantz as an expert in firearms identification, and remanded the case for a new trial. *Williams,* 761 P.2d at 261.

## II.

■ In this case we must decide whether the trial court abused its broad discretion

---

**1.** § 18–3–102(1)(a), 8 C.R.S. (1978).

**2.** *Williams v. District Court* was an original proceeding in which we held that the district court's refusal to quash subpoenas against the

defendant's attorney and others was an abuse of discretion. 700 P.2d at 550.

**3.** § 18–3–103(1)(a), 8 C.R.S. (1978).

to determine whether Lantz was qualified to testify as an expert in the field of firearms identification. We hold, based on the record of Lantz' qualifications, that the trial court did not abuse its discretion in declining to qualify Lantz as an expert in the field of firearms identification.

### A.

We begin our analysis with CRE 702, which is identical to Fed.R.Evid. 702 and provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The "crucial question" trial courts must answer when determining the admissibility of proffered expert testimony is: " 'On *this subject* can a jury from *this person* receive appreciable help?' " 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[01], at 702–7 to 702–8 (1988) (emphasis in original) (quoting Wigmore, *Evidence* § 1923, at 21 (3d ed. 1940)). "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Fed.R.Evid. 702 advisory committee's note (quoted in E. Cleary, et al., *McCormick on Evidence* § 13, at 33 n. 9 (3d ed. 1984)). As the Fifth Circuit stated in *In re Air Crash Disaster at New Orleans, Louisiana*, 795 F.2d 1230, 1233 (5th Cir.1986), the "trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument." "A decision excluding expert testimony offered by a criminal defendant is perhaps somewhat more susceptible of reversal because of the courts' sensitivity to the defendant's need and lack of access to the personnel available to the state." 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[04], at 702–47 to 702–48 (1988) (footnote omitted).

A trial court has broad discretion to determine the admissibility of expert testimony, and appellate courts may not overturn a trial court's ruling unless it is manifestly erroneous. *Hamling v. United States*, 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974); *In re Air Crash Disaster*, 795 F.2d at 1233; *People v. DeLuna*, 183 Colo. 163, 165, 515 P.2d 459, 460 (1973). In *United States v. Bermudez*, 526 F.2d 89, 98 (2d Cir.1975), *cert. denied*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976), the Fifth Circuit stated that the trial court's "quite wide discretion in determining the qualifications and competency of a witness to express an opinion as an expert" should not be disturbed unless there is a clear showing of abuse of discretion. *See also King v. People*, 785 P.2d 596, 603–04 (Colo.1990); *People v. Hampton*, 746 P.2d 947, 952–53 (Colo.1987); *People v. District Court*, 647 P.2d 1206, 1209 (Colo.1982). "This deference reflects the superior opportunity of the trial judge to gauge both the competence of the expert and the extent to which his opinion would be helpful to the jury." *In re Air Crash Disaster*, 795 F.2d at 1233.

### B.

The record in the present case contains substantial support for the district court's ruling that Lantz was not qualified to testify as an expert in the field of firearms identification.

Lantz testified that the only instruction he received in firearms identification consisted of one course he audited on the subject in 1971 or 1972 at Michigan State University. Lantz was unable to remember the name of the course, and he admitted that in earlier testimony he had been unable to remember the name of the instructor of the course. Lantz testified that he did not receive a grade in the course and that he could not remember taking any examinations in the course.

Defense counsel asked Lantz: "What is your experience and training in the area [of comparing a bullet] to the weapon it may

have been fired from?" Lantz replied that he had "done a great deal of research work in the area[,] particularly starting with my work at the University of Michigan where I did a goodly amount of work in the area of electron microscopy." Lantz testified that this research involved "finding out whether or not the old work on much of the ballistics, much of the ballistics comparison was done now was indeed valid using much more modern techniques." Lantz testified that at Michigan State University he received a grant "from the university electron-optics committee to use scanning electron-microscopy to work out newer techniques for bullet and cartridge case comparison to see whether those bullets are indeed the same." Lantz testified that he "wanted to see whether or not we could still differentiate bullets really well or were we going to get confused because of much more modern steels and much more modern rifling techniques, and for that matter the use of much more modern electron-microscopic comparison techniques."

Lantz' descriptions of his research did not establish that it involved identifying particular bullets as having been fired from particular weapons. Lantz' descriptions of his electron microscope research fairly suggest that the research involved determining whether differences in bullets which were apparent under an optical microscope were also detectable with an electron microscope.

Lantz admitted that part of his academic research involved elemental composition analysis, which does not involve comparing certain bullets with test bullets fired from a particular gun. Lantz agreed with the district attorney's characterization that "[e]lemental composition analysis [involves]

comparing one bullet to [determine whether it has] the same trace elements ... [as] another set or box of bullets." Lantz stated that "[t]hat is one of the things we were trying to do, to see whether or not we could identify a particular bullet as having come from a particular lot of lead or copper." The district attorney asked Lantz: "[Elemental composition analysis] won't do any good with regard to a comparison of a test bullet with a bullet pulled from a body, would it?" Lantz answered: "No, sir." Lantz did not explain how much of his research at Michigan State University involved elemental composition analysis. Thus Lantz' testimony did not clarify how much, if any, of Lantz' research involved determining whether a particular bullet was fired from a particular rifle.

Lantz testified that in the previous ten or twelve years he had done close to 100 comparisons of test bullets with bullets claimed to have been fired from a particular weapon. However, Lantz did not indicate in what context he performed these comparisons. He simply referred to the comparisons as "non-research work."

Lantz testified that in about ten cases he had testified as an expert in court about the comparisons he had done. However, Lantz testified that the last time he qualified as an expert in firearms identification was in either 1979 or 1980, approximately five years before Lantz attempted to qualify as an expert in the present case.[4] Lantz did not identify in which states or in which courts he had qualified as an expert in firearms identification, and he admitted that "prior to this case" he had never been qualified in Colorado as an expert in firearms identification.[5] Lantz admitted that no one supervised the comparisons he did,

4. In response to a question from the court, Lantz stated: "I have worked on several cases since [January of 1984], but I haven't been called to testify to a great extent because I agreed with the prosecution."

5. The record suggests that Lantz may have been qualified as an expert in firearms identification at the defendant's first trial. The record contains the following question and answer:

Q: Prior to this particular case, have you ever been qualified as an expert in firearms identification in the state of Colorado?

A: I don't believe so prior to this case, no.

Before the district court ruled on whether to qualify Lantz as an expert in firearms identification, defense counsel argued that Lantz "qualified as an expert the last time the case was tried, never did the methods he used come into question." Lantz did not testify that he qualified as an expert in firearms identification at the defendant's first trial.

including the comparisons he reported in trial testimony. Lantz did not identify the cases in which he gave expert testimony as criminal or civil cases, and he did not explain the substance of his testimony. In response to defense counsel's request that Lantz give the court "some idea of the percentage of time your conclusions turned out to be the same as the prosecution's," Lantz testified that "every time I agreed with the prosecution, that is I did my experiments, reported to the defense attorney, or just got the report from the C.B.I. by one means or another and I agree."

Lantz also testified that he was appointed by the National Rifle Association to serve on a committee of technical experts concerned with firing range safety. Lantz testified that the N.R.A. often investigates claims that bullets are escaping the confines of firing ranges. Lantz testified that the N.R.A. committee wanted to determine whether bullets which were discovered outside the range were fired from particular weapons used in target matches.[6]

Finally, Lantz testified that he was not recognized by the only national organization which recognizes qualified experts in the field of firearms identification.

The district court concluded that there was no indication that anyone had ever verified Lantz' firearms identification research methods or the accuracy of his classroom and research work. The district court stated that Lantz could

> cite no organization, group or entity that sets standards that should be used by experts in this field and which standards he subscribes to[,] and can't show that if he subscribed to any such standard he's been demonstrated or proved to be capable of operating within those standards. So it really leaves me in a vacuum in terms of how I should analyze whether

he's good at what he does, whether he's bad at what he does.

## C.

▰ Whether or not Lantz is qualified to offer an expert opinion in this case is a preliminary question of fact to be determined by the trial court pursuant to CRE 104(a). The trial court as the trier of fact has broad discretion to rule on the competency of Lantz to testify as an expert in firearms identification. *See United States v. Huber*, 603 F.2d 387 (2d Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *United States v. King*, 532 F.2d 505 (5th Cir.), *cert. denied*, 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976); *People v. Tidwell*, 706 P.2d 438 (Colo.App.1985). In *Huber*, 603 F.2d at 399, the Second Circuit sustained a federal district court's refusal to certify a proffered expert in psychoanalysis who had studied psychoanalysis at the Boston Psychoanalytic Institute, was certified by the American Psychoanalytic Institute, and had treated people regularly without supervision for a number of years. *Huber*, 603 F.2d at 399. The Second Circuit stated that "[w]hile we do not say that all of us would have ruled the same way, we hold that the district judge did not abuse his broad discretion in deciding that this witness was not qualified in this case." *Id.*

In *United States v. King*, 532 F.2d at 509, the Fifth Circuit upheld the trial court's refusal to qualify a witness as a handwriting expert. The witness was employed by the Social Security Administration in a job unrelated to handwriting, had taken a correspondence school course on handwriting analysis, had no laboratory, and had not trained under anyone. *Id.*

In *People v. Tidwell*, 706 P.2d 438, the court of appeals upheld a trial court ruling refusing to recognize a defense witness as

---

**6.** Lantz testified that the N.R.A. committee "was particularly concerned with firearms, firearms violations, range safety, how could you, for example, really compare particularly we are concerned, at least I was concerned, with damage to bullets. One of the problems the National Rifle Association often has is someone will claim that a particular bullet escaped from a

particular otherwise safe firing range in an attempt by, for example, a land developer to close down an IRA [sic] sponsored range. What we wanted to do was see whether or not we really could show that bullet came from a particular rifle or particular type of weapon that was used in target matches."

an expert in document examination. The court of appeals based its holding on the ground that the witness could not provide an understandable explanation of her qualifications, she was not certified by the American Board of Document Examiners, her actual experience was not defined, and she had never before been qualified as an expert witness. *Id.*

We reverse the court of appeals judgment and remand to the court of appeals for consideration of the issues not addressed in the defendant's appeal.

QUINN, C.J., specially concurs.

ERICKSON, J., dissents.

KIRSHBAUM, J., dissents, and ERICKSON and MULLARKEY, JJ., join in the dissent.

Chief Justice QUINN specially concurring:

I specially concur in the judgment. The defendant attempted to qualify Robert Lantz as an expert witness in firearms identification for the purpose of eliciting an opinion that the bullet found at the crime scene was too badly damaged to be matched to a particular weapon. The trial court ruled that Lantz, who was permitted to testify on other matters as an expert witness in analytical chemistry, was not qualified to testify as an expert witness in firearms identification. Because the question of the adequacy of Lantz's qualifications is extremely close, I believe deference to the trial court's resolution on the issue is required.

The question in this case is not whether expert testimony on the feasibility of scientifically matching the bullet to a particular weapon would have assisted the jury in resolving this case—clearly it would have. Rather, the question is whether Lantz was qualified to offer an opinion on that subject. Whether a witness is qualified as an expert on a particular subject is a preliminary question of fact to be determined by the trial court pursuant to CRE 104(a). Although liberality in evaluating the qualifications of a proffered expert witness normally should be the rule, the final determination of the competency of a witness to testify as an expert rests in the sound discretion of the trial court. *E.g., Hamling v. United States,* 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974); *People v. DeLuna,* 183 Colo. 163, 165, 515 P.2d 459, 460 (1973); *White v. People,* 175 Colo. 119, 123, 486 P.2d 4, 6 (1971); M. Graham, *Handbook of Federal Evidence* § 702.3, at 612–13 (2nd ed. 1986). The often stated rule is that a court abuses its discretion only if, based on the particular circumstances confronting it, its ruling is manifestly arbitrary, unreasonable, or unfair. *E.g., King v. People,* 785 P.2d 596, 603 (Colo.1990); *People v. Hampton,* 758 P.2d 1344, 1348 (Colo.1988); *People v. Milton,* 732 P.2d 1199, 1207 (Colo.1987).

In this case, Lantz acknowledged that the Association of Firearms and Tool Mark Examiners was a professional organization comprised of experts dealing with the kind of scientific testing involved in this case but that he was not a member of that organization. The trial court, in ruling on the prosecution's objection to Lantz's proferred testimony, remarked that it was at a loss to determine whether Lantz subscribed to any recognized standards, and whether he had operated within such standards, in conducting his examination of the bullet. I cannot say with any degree of assurance that the trial court's ruling on the competency of Lantz to testify as an expert constituted an abuse of discretion. I therefore concur in the reversal of the judgment of the court of appeals.

Justice ERICKSON dissenting:

I join Justice Kirshbaum's dissent. Chief Justice Quinn's special concurrence points out the difficulty of determining from the record whether the trial judge's ruling on the competency of Dr. Lantz to testify as an expert witness constituted an abuse of discretion. At 801. The court of appeals with a 2–1 division concluded that it was an abuse of discretion. *People v. Williams,* 761 P.2d 258 (Colo.App.1988). Our court is also divided in reviewing the foundation laid to qualify Dr. Lantz as a firearms expert.

Dr. Lantz had previously qualified and testified as an expert in firearms identification in about ten other cases. The foundation qualifying Dr. Lantz as a firearms expert was minimal and not an example to be followed. However, the gravity of the charge and the qualifications of Dr. Lantz convince me that the failure to permit him to testify as a firearms expert under the facts in this case was an abuse of discretion which requires a new trial.

Justice KIRSHBAUM dissenting.

The plurality and the special concurrence conclude that the trial court properly sustained the prosecution's objection to the defendant's request that Lantz be permitted to testify as an expert witness in the field of firearms identification. I respectfully dissent.

I wholeheartedly support the principle that trial courts enjoy broad discretion under CRE 702 to determine whether a prospective witness is qualified to testify in the form of an opinion on a particular issue. However, a trial court's application of CRE 702 must be reversed if the record reveals a clear abuse of that discretion. *King v. People,* 785 P.2d 596, 603–04 (Colo. 1990); *People v. Hampton,* 746 P.2d 947 at 952–53; *People v. Gomez,* 632 P.2d 586 (Colo.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); *People v. Davis,* 187 Colo. 16, 528 P.2d 251 (1974); *see People v. District Court,* 647 P.2d 1206, 1209 (Colo.1982).[1] In this case the trial court adopted an erroneous test in concluding that Lantz was not an expert in firearms identification and neglected to consider evidence before it that unquestionably established his qualifications as an expert in that field. Furthermore, the narrow test adopted by the trial court dangerously undermines the purposes of CRE 702.

Lantz was offered as an expert in the field of firearms identification. The only definition of this field before the trial court was the following definition supplied by Lantz: "[F]irearms identification ... includes whether or not the firearm could be used with a particular sort of cartridge.... It also includes particularly the area of forensic ballistics. That is identification of whether or not a particular bullet came from a particular weapon." No other definition of this field of expertise was offered at trial, and it is supported by treatises discussing the field. *See* J.E. Davis, *An Introduction to Tool Marks, Firearms and the Striagraph,* 68 (1958); N. Morland, *An Outline of Scientific Criminology,* 85 (1950).

The plurality suggests that the record does not establish that Lantz' research work in firearms identification involved comparisons of bullets with weapons. I believe the record compels a contrary conclusion. Lantz stated that a "great deal" of his research work at the University of Michigan involved using an electron microscope to determine whether a particular bullet came from a particular gun. Lantz also testified that his work as a technical expert with the National Rifle Association Range Development Committee consisted of determining whether particular bullets came from particular weapons. At Michigan State University he analyzed techniques of identifying bullets and conducted over 1,000 examinations to identify particular characteristics of bullets. His participation in judicial proceedings, including the initial trial in this case, was participation as a firearms identification expert. This testimony established that over a period of some twenty years Lantz had acquired experience, training, and knowledge in the field of firearms identification, including particularly the comparison of fired bullets to weapons.

The plurality discusses several factors about which Lantz did not testify, such as what percentage of his research work at Michigan State University concerned firearms identification, in what contexts his bullet comparisons were performed, and particular data respecting those jurisdictions in which he had testified as an expert witness. He was not asked about these matters, and the question of whether his

---

1. I do not read the plurality's reference to a "manifest error" standard of review as announcing a different appellate standard. Plurality op. at 6.

experience, knowledge and training was sufficient to enable him to appreciably help the jury must be answered primarily on the basis of the evidence that was before the trial court.

Rule 702, CRE, is expressly designed to encourage the introduction of evidence that would assist the trier of fact in rendering a decision in a particular case. This purpose parallels the general goal of the rules of evidence to encourage the admission of relevant evidence to facilitate the truth-seeking function of the trial process unless the prejudicial effect of so doing outweighs the probative value of the evidence. CRE 102, 402, 703; *see People v. Ortega*, 672 P.2d 215 (Colo.App.1983); *see also* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[01] at 702–07 to –09 (1988); 7 Wigmore, *Evidence* § 1923 (Chadbourn rev. 1978); Cleary, *McCormick on Evidence* 33 (3d ed. 1984). In determining whether to permit a witness to testify in the form of an opinion, the primary concern is whether the witness' knowledge of the subject matter is such that his or her opinion will more likely than not assist the trier of fact in arriving at the truth. *See United States v. Barker*, 553 F.2d 1013 (6th Cir.1977); *Holmgren v. Massey–Ferguson Inc.*, 516 F.2d 856 (8th Cir.1975).

The determination of whether a person is sufficiently qualified to testify as an expert witness must by necessity be based on the particular circumstances of a particular case. The nature of the issue in question, the familiarity of the trier of fact with the subject matter and the availability of other non-opinion evidence are factors which, in addition to the background of the potential witness, may influence the decision. While the quality of the processes by which a person has obtained specialized information may also be considered, a witness need not possess a formal college degree to be recognized as a person having sufficient knowledge to testify in the form of an opinion, *White v. People*, 175 Colo. 119, 486 P.2d 4 (1971), and the proposed expert need not satisfy an overly narrow test of his or her own qualifications. *See Gardner v. General Motors Corp.*, 507 F.2d 525 (10th Cir.1974).

In concluding that Lantz was not qualified to testify as an expert witness, the trial court stated as follows:

[The evidence fails] to indicate cross-reference or checking mechanism[s] to see whether or not Dr. Lantz is skilled in performing these comparisons. It may well be that he does them perfectly well or perfectly right, but it may be also that he does them wrong. We don't know the answer to that question.

Noting that Lantz was not a member of any national organization that sets standards for firearms identification, the trial court concluded its ruling with the following statement:

So it really leaves me [in] a vacuum in terms of how I should analyze whether he's good at what he does, whether he's bad at what he does.

These statements indicate that the trial court based its ultimate ruling solely on its concern about Lantz' competence. However, a trial court must consider the scope of a person's knowledge and experience as well as the person's skill in determining whether the person is qualified to testify as an expert witness. *See Holmgren v. Massey–Ferguson Inc.*, 516 F.2d 856 (8th Cir. 1975). While objective verification of the accuracy of a person's testing methodology may be desired, CRE 702 authorizes expert testimony on the basis of experience and knowledge as well as on the basis of formal training. Whether Lantz performed tests accurately is no doubt a factor for consideration in weighing the strength of his testimony; it is not a factor that bears on whether he has sufficient experience to testify in the form of an opinion. Furthermore, contrary to the trial court's comments, the evidence in this case that in almost all instances Lantz' test results had been confirmed by identical test results obtained by other firearms identification experts does indicate that Lantz' testing procedures were accurate.

In this case the trial court failed to consider the numerous evidentiary facts that confirmed Lantz' substantial knowledge about and experience with a subject con-

cededly unfamiliar to the jury. The trial court also failed to consider the fact that in the absence of Lantz' testimony the defendant in this case could produce no witness to contradict the revised opinion of the prosecution's expert witness. *See* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[04], at 702–47 to –48 (1988). By focusing solely on the erroneous assumption that Lantz had not demonstrated the accuracy of his tests, the trial court failed to apply the appropriate standard required by CRE 702.

I also believe the result reached by the plurality and the special concurrence contravenes the primary purpose of CRE 702. Rule 702, CRE, like its identical federal counterpart, is designed to encourage the admission of relevant evidence that will prove helpful to the trier of fact. *See, e.g., Gardner v. General Motors Corp.,* 507 F.2d 525 (10th Cir.1974); *Mannino v. International Mfg. Co.,* 650 F.2d 846 (6th Cir.1981). The trial court's overly restrictive application of the rule deprived the jury of information concerning the only evidence in the case linking the defendant to the crime.

The rule is designed to encourage the admission of such evidence. Application of the multi-factored standard appropriate for questions arising under CRE 702 requires the conclusion that Lantz had sufficient knowledge of and experience in the field of firearms identification to assist the jury in evaluating the testimony of the prosecution's critical testimony. In my view, the trial court's contrary ruling constituted a gross abuse of discretion.[2]

ERICKSON and MULLARKEY, JJ., join in this dissent.

---

**2.** As indicated, I believe the trial court's erroneous ruling was critical in this case, and there-fore do not consider the error to be harmless under C.R.Cr.P. 52(a).