The **PEOPLE** of the State of Colorado,
Plaintiff–Appellee,

v.

Philip **GALIMANIS**, Defendant–
Appellant.

No. 95CA0401.

Colorado Court of Appeals,
Div. V.

Feb. 6, 1997.

Rehearing Denied March 20, 1997.

Certiorari Denied Oct. 20, 1997.

**628**

Gale A. Norton, Attorney General, Stephen K. ErkenBrack Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Robert M. Petrusak, Sr. Assistant Attorney General, Denver, for Plaintiff–Appellee.

David F. Vela, Colorado State Public Defender, Andrew C. Heher, Deputy State Public Defender, Denver, for Defendant–Appellant.

Opinion by Judge DAVIDSON.

Defendant, Philip Leslie Galimanis, appeals from the judgment entered on a jury verdict finding him sane at the time of commission of first degree murder, motor vehicle theft, and crime of violence. He contends that the trial court erred by excluding expert opinion testimony regarding his sanity two years prior to his killing of the victim, and by excluding certain specific evidence of his insanity that occurred after the killing. He also contends that the trial court erred by failing to submit certain instructions to the jury. We affirm.

The facts of this case are set forth in *People v. Galimanis*, 765 P.2d 644 (Colo.App. 1988), *cert. denied*, 501 U.S. 1238, 111 S.Ct. 2872, 115 L.Ed.2d 1037 (1991).

In 1983, victim was found dead on the floor of her apartment. She had been beaten, stabbed, and decapitated. Defendant fled the scene in victim's car and was later discovered asleep in that vehicle. Charged with first degree murder, motor vehicle theft, and crime of violence, defendant entered a plea of not guilty by reason of insanity.

Two separate trials were held. In the first, a sanity trial conducted pursuant to § 16–8–104, C.R.S. (1986 Repl.Vol. 8A), a jury found defendant sane. In the second, a jury found defendant guilty of the crimes charged.

Defendant appealed, and a division of this court in *People v. Galimanis, supra,* reversed on the ground that defendant's invocation of his *Miranda* rights had been improperly used as evidence of his sanity. The case was remanded for a new sanity trial.

In 1991, after certiorari had been denied by both the Colorado and the United States Supreme Courts, defendant was found incompetent to stand trial and was committed to the state hospital. Three years later, in 1994, defendant was determined to be competent to stand trial. At this second sanity trial, a jury found defendant sane, and this appeal followed.

I.

Defendant first contends that the trial court erred by not allowing an expert witness for the defense to offer an opinion on defendant's ability to distinguish right from wrong in 1981, two years before the killing. We perceive no error.

A trial court may admit expert testimony if it will assist a trier of fact to understand the evidence or to determine a fact in issue. CRE 702; *People v. Williams*, 790 P.2d 796 (Colo.1990). Whether expert testimony will aid the jury in resolving an issue is within the discretion of the trial court, *Lanari v. People*, 827 P.2d 495 (Colo.1992), and appellate courts may not overturn a trial court's ruling on the admissibility of expert testimony unless it is manifestly erroneous. *People v. Williams, supra.*

Moreover, the trial court retains discretionary authority under CRE 403 to exclude relevant expert testimony if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." *Campbell v. People*, 814 P.2d 1 (Colo.1991). A determination as to relevancy will not be reversed on review absent abuse of discretion. *See* CRE 403; *People v. Lowe*, 660 P.2d 1261 (Colo.1983).

A clinical psychologist, who had examined defendant on three occasions in 1981 at defendant's mother's behest, appeared as an expert witness for the defense. He testified that he had diagnosed defendant at that time

as suffering from borderline psychosis. The trial court allowed the expert to testify to any and all factual evidence of defendant's insanity, to his clinical diagnosis of defendant's behavior, and, particularly, that someone suffering from borderline psychosis could fall within the legal definition of insanity. The court, though, precluded the psychologist's opinion as to whether defendant was capable, in 1981, of distinguishing right from wrong—that is, the expert was precluded from offering an opinion as to whether defendant was legally insane in 1981.

We conclude that the trial court properly exercised its discretion in excluding that portion of the psychologist's testimony. Here, the single issue to be determined by the jury was defendant's legal sanity or insanity at the time of the killing in 1983. Hence, an opinion on defendant's legal sanity at any other time—unlike evidence of psychotic behavior, or psychological diagnosis of such behavior—simply did not appear to be pertinent. Similarly, because the jury was expressly instructed to determine defendant's sanity specifically at the time of the killing, any such opinion would have been extremely confusing. Hence, any marginal relevance of the expert's opinion would have been substantially outweighed by its likely prejudicial effect.

## II.

■ Defendant next contends that the trial court improperly excluded evidence of specific instances of defendant's conduct that occurred during defendant's confinement at the state hospital. Again, we disagree.

■ Traditionally, the scope of evidence admissible on the issue of insanity is broad. *People v. Wright*, 648 P.2d 665 (Colo.1982). While it is proper to inquire into the mental condition of the defendant both before and after the commission of the act, the admissibility of evidence in an insanity trial depends on whether "the inquiry bears such relation to the person's condition of mind at the time of the crime as to be worthy of consideration in respect thereto." *See Garrison v. People*, 151 Colo. 388, 392, 378 P.2d 401, 403 (1963). And, a determination as to such relevancy, being within the sound discretion of the trial

court, will not be reversed absent abuse of discretion. *See* CRE 403; *People v. Lowe, supra.*

At trial, two psychiatrists who had examined defendant in the months subsequent to the killing appeared as expert witnesses for the defense. Both testified as to specific instances of what they termed psychotic behavior on defendant's part during their meetings. They noted, for example, that he often appeared to be lost in conversations with himself and that he appeared to react constantly to internal stimuli. They also cited inappropriate laughing and smiling, incoherent mumbling, and bizarre eruptive gestures.

One expert testified that he had diagnosed defendant as suffering from atypical psychosis, and testified that he believed that if he had spent more time with defendant, he would likely have been able to characterize defendant's disorder as rising to the level of schizophrenia. The other diagnosed defendant as suffering from schizophrenia and that he was "borderline."

The trial court also permitted these experts to testify as to diagnoses made by hospital staff while defendant was at the state hospital—defendant was diagnosed, at six-month intervals, as suffering from "chronic undifferentiated schizophrenia"—but did not permit either psychiatrist to testify to evidence in the hospital records of the specific instances of conduct occurring at the hospital. The court determined that to allow the defense to present specific instances of conduct demonstrating defendant's insanity would also require it to allow the prosecution to present specific acts revealing defendant's sanity. The trial court reasoned that such an inquiry would be overly time consuming and confusing to the jury. Furthermore, it determined that such an inquiry would not be relevant to the determination of defendant's sanity at the time of the killing.

Under these circumstances, we find no abuse of discretion on the trial court's exclusion of this evidence.

## III.

Defendant's primary contention is that the trial court erred in failing to provide, *sua*

*sponte,* certain instructions to the jury. We disagree.

All jury instructions must be read and considered together, and if, collectively, they adequately inform the jury of the law, there is no reversible error. *People v. Orona,* 907 P.2d 659 (Colo.App.1995).

Here, the trial court submitted the following jury instruction on the affirmative defense of insanity, to which defendant had no objection at trial:

A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act, or being able so to distinguish, has suffered such an impairment of mind by disease or defect as to destroy the will power and render him incapable of choosing the right and refraining from doing the wrong is not accountable; and this is so howsoever such insanity may be manifested, by irresistible impulse or otherwise, but care should be taken not to confuse such mental disease with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these causes the person is accountable to the law.

This instruction tracked the definition of insanity set forth by statute as well as the pattern jury instruction defining insanity. By statute, an instruction of this nature is required to be given to the jury. *See* § 16–8–101, C.R.S. (1986 Repl.Vol. 8A); *see also* COLJI–Crim. No. 3:09–A (1993 Supp.).

### A.

Defendant argues that the trial court was required to submit an additional instruction, set forth in *COLJI–Crim.* No. 3:10–A (1993 Supp.), informing the jury that:

[T]he phrase 'incapable of distinguishing right from wrong' refers to a cognitive ability, due to a mental disease or defect, to distinguish right from wrong as measured by a societal standard of morality, even though the person may be aware that the conduct in question is criminal. The phrase 'incapable of distinguishing right from wrong' does not refer to a purely personal and subjective standard of morality.

We disagree.

According to the comments to *COLJI–Crim.* No. 3:10–A, this pattern instruction was prompted by *People v. Serravo,* 823 P.2d 128 (Colo.1992). In that case, Serravo contended that he had murdered his wife knowing that his conduct was wrong under societal standards of morality but believing, nonetheless, that it was morally right because he was under a delusion that he was on a mission from God. In addition to an instruction tracking the statutory definition of insanity—such as the instruction given here—the jury in *Serravo,* at defendant's request, was additionally instructed that the phrase "incapable of distinguishing right from wrong" includes a person who appreciates that his conduct is criminal, but, because of mental disease or defect, believes that the conduct is morally right.

On review, the supreme court disapproved the instruction. First, it clarified that the "wrong" referred to in the legal definition of insanity is moral wrong, not simply legal wrong. Second, the court determined that such moral wrong refers not to a wrong according to personal or subjective standards, but to a wrongful act measured by societal standards of morality. In that regard, the court rejected the concept that a person could be adjudicated insane even if he knew the act in question was both forbidden by law and condemned by society, but nevertheless harbored a personal belief that the conduct was right. Thus, for example, a person who believed he was justified in killing intravenous drug users because of the harm they do to society could not be adjudicated insane.

In its discussion, however, the *Serravo* court also clarified that, in deciding legal insanity, a jury could properly consider evidence that a defendant's cognitive ability to distinguish right from wrong has been destroyed as a result of a psychotic delusion that God has demanded the conduct. The court cited the often used example of a mother who murders the child she loves un-

der a delusion that God appeared to her and ordered the sacrifice. Under such circumstances, such a delusion would "obscure moral distinctions" and render the mother incapable of distinguishing right from wrong.

In its disapproval of the instruction given by the trial court in *Serravo*, the supreme court advised that if a clarifying instruction on the definition of legal insanity is given, it should clearly inform the jury that, even if the defendant is aware that the conduct is criminal, the question to be determined is whether defendant had the cognitive ability to distinguish right from wrong as measured by a societal standard of morality. The court stated that "any such instruction" should also "expressly inform the jury that the phrase 'incapable of distinguishing right from wrong' does not refer to a purely personal and subjective standard of morality." *People v. Serravo, supra,* 823 P.2d at 139.

We disagree with defendant that it was necessary here to give the *Serravo* clarifying instruction.

Defendant's theory of the case was that he was in the midst of a psychotic episode at the time of the crime such that he was incapable of knowing right from wrong. More specifically, he claimed that he suffered from a permanent state of latent psychosis that resulted in periodically unpredictable and violent episodes. During those episodes, he asserted, his visual and auditory perceptions became so impaired that he could not control his behavior or distinguish between right and wrong.

Thus, in contrast to *Serravo*, where the defendant asserted that he knew that murdering his wife was against the law as well as the morals of society but considered the act to be morally right because it had been decreed by God, here, defendant did not contend that his actions were justified under his own moral beliefs or moral code, nor did he assert that he was conscious that what he was doing was right or wrong, either legally or morally. Rather, he argued that he was entirely detached from reality, acting completely by impulse, without any rational thought processes of any kind.

Furthermore, although during the trial, there were a few references that defendant said he felt omnipotent and God-like at times, he provided no evidence that he was commanded by God to kill the victim. Thus, no clarification of the otherwise proper definition of sanity given to the jury was necessary.

■ Additionally, because the language in the *Serravo* clarifying instruction—that moral wrong is measured by society's standards, not personal standards—did not address any issue in this case, there could be no prejudice to defendant by the failure to give the instruction. Similarly, because there was no evidence concerning defendant's personal moral beliefs, to the extent that, in the absence of such instruction, the jury might have considered his "subjective" standard of morality, defendant could not have been prejudiced.

■ Defendant points out, however, that the "Notes on Use" following *COLJI–Crim.* No. 3:10–A state that: "[t]his instruction must be given in all insanity cases." Thus, he concludes, regardless of the evidence in the case, it was mandatory to give the instruction. We disagree.

■ First, we note, the accompanying comments, like the pattern jury instructions as a whole, are intended as guidelines and are approved only in principle until tested in adversarial proceedings. *See COLJI–Crim.* v (1983). Moreover, these particular comments to *COLJI–Crim.* No. 3:10–A are confusing in light of the proscriptive language in the "Notes on Use" to Instruction 3:09–A, the statutory definition of insanity with which the instruction given here conforms. *See* COLJI–Crim. 3:09–A (Notes on Use) ("This instruction must be given in every sanity trial [and] shall constitute the *sole test of sanity.*" (emphasis added)).

Furthermore, to the extent that the comment implies that this instruction is mandatory under *Serravo*, it is inaccurate. In context, it is apparent in *Serravo* that when the supreme court noted that a clarifying instruction on the definition of legal insanity "should clearly state" that right from wrong is measured by a societal standard of morality, it

was referring only to instances when a clarifying instruction was necessary.

### B.

■ For similar reasons, we also reject defendant's contention that the court's failure to include an instruction that a "deific-decree" delusion could constitute legal insanity is reversible error.

According to *Serravo,* a person may be legally insane when he has a "deific-decree" delusion, that is, that his cognitive ability to distinguish right from wrong with respect to the act has been destroyed as a result of a psychotic delusion that God has decreed the act.

Here, the record reflects a few tangential references that defendant felt God-like at times and that he had referred to himself as the devil. However, as discussed, there was no evidence that defendant felt he was under any compulsion by God to kill the victim. Nor did any expert testify, either directly or implicitly, that defendant suffered from a deific-decree delusion, or any delusion even remotely of that nature.

■ Moreover, deific-decree delusion is not an exception to the "incapable of distinguishing right from wrong" legal standard that in all cases requires separate instruction; rather, it is an "integral factor in assessing a person's cognitive ability to distinguish right from wrong." *People v. Serravo, supra,* 823 P.2d at 139. As such, to the extent there was any evidence of perceived deific compulsion, it would have been considered by the jury with or without the instruction.

### C.

■ We also reject defendant's argument that the trial court erred in failing to provide an instruction on the phrase "moral obliquity."

The supreme court has determined that the words "depravity" and "moral obliquity," while not used in everyday conversation, are well within the comprehension of a jury. *Simms v. People,* 174 Colo. 85, 482 P.2d 974 (1971). Thus, the failure of a trial court to define these terms further does not constitute error. *People v. Martin,* 851 P.2d 186 (Colo.App.1992).

As he did with respect to the concept of "incapable of distinguishing right from wrong," defendant again argues that the failure to provide the clarifying instruction on "moral obliquity" found in *COLJI–Crim.* No. 3:11–A (1993 Supp.) contradicts the accompanying Notes on Use which require its use, and, therefore, constitutes reversible error. However, as discussed, the supreme court has determined that term "moral obliquity" requires no additional explanation, and nothing in *Serravo* may be read to require such an explanation or to otherwise contradict the rule established in *Simms.* Further, as discussed, the Notes on Use simply are guidelines, and to the extent the accompanying comments indicate the instruction is mandatory, they are inaccurate.

### D.

■ Finally, we do not agree that the trial court erred in its failure to include an instruction that lay witnesses' testimony concerning defendant's mental condition was proper evidence that should be considered by the jury.

First, it was apparent from the fact that the lay testimony was admitted into evidence that such testimony could be considered. Second, taken as a whole, the jury instructions accurately informed the jury that lay testimony should indeed be considered. The first jury instruction given exhorted the jury to "determine the facts, and to determine them only from the evidence in this case." The instruction further noted that "all of the evidence" should be considered. The second jury instruction again stated that the question of defendant's sanity or insanity should be determined "wholly upon the evidence and the written instructions." The eighth instruction charged the jury to weigh the testimony of each witness. In the ninth instruction, in informing the jury of the weight it should give to expert testimony, the court expressly stated that "jurors are not bound by he testimony of experts; their testimony is to be weighed as that of any other witness."

Thus, to inform the jury specifically that it could consider the testimony of lay witnesses was, at best, superfluous. *Cf. People v. Lee,* 199 Colo. 301, 302, 607 P.2d 998, 999 (1980) ("It is not reversible error to refuse an instruction tendered by the defense when the contents of that instruction are embodied in the court's other instructions.").

### E.

Hence, we conclude that it was not error for the trial court to fail to give each or any of the four additional jury instructions which defendant now contends were necessary. Nor is there any discernible prejudice to defendant resulting from the absence of these instructions and, consequently, no basis to doubt the reliability of the findings of sanity is present here either. *See People v. Williams,* 899 P.2d 306 (Colo.App.1995) (if no objection is made to the instructions as they were given at trial and no alternative instructions are tendered, a plain error standard of review is appropriate); *People v. Kruse,* 839 P.2d 1 (Colo.1992) (plain error occurs if the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction).

Finally, because we find no error, we need not address defendant's argument that the failure of the trial court to provide these additional instructions to the jury constituted structural error.

The judgment is affirmed.

ROTHENBERG and ROY, JJ., concur.